806 So.2d 32 (2001)
William G. CORBELLO, et al.
v.
IOWA PRODUCTION, Shell Oil Company, Shell Western E & P, Inc., et al.
No. 01-567.
Court of Appeal of Louisiana, Third Circuit.
December 26, 2001.
Rehearing Denied February 20, 2002.
*36 John Michael Veron, Richard E. Gerard, Jr., Scofield, Gerard, Veron, Singletary & Pohorelsky, Lake Charles, LA, Counsel for Plaintiffs/Appellees: The Rosa Heyd Corbello Family Trust, Maisie Johnson Heyd, Alverdy Heyd Veron, Lawrence Heyd, Mary Heyd Fontenot, Bernice Heyd Hymes, William G. Corbello.
Thomas M. McNamara, Patrick W. Gray, Liskow & Lewis, Lafayette, LA, James E. Blazek, Adams and Reese, New Orleans, LA, Marie Roach Yeates, Vinson & Elkins, Houston, TX, Counsel for Defendants/Appellants: Shell Oil Company, Shell Western E & P, Inc.
Thomas A. Harrell, J. Lanier Yeates, P.C., Baton Rouge, LA, Counsel for Defendants/Appellants: Shell Western E & P, Inc., Shell Oil Company.
Matthew Joseph Randazzo, III, Gordon, Arata, McCollam, New Orleans, LA, Counsel for: Rosewood Resources, Inc.
Court composed of ULYSSES GENE THIBODEAUX, JIMMIE C. PETERS, and MICHAEL G. SULLIVAN, Judges.
SULLIVAN, Judge.
This is an appeal from a judgment in favor of the heirs of Ferdinand Heyd (Plaintiffs) and against Shell Oil Company *37 (Shell). Plaintiffs and Shell appeal the judgment. For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.

Facts
The basis of this litigation is a surface lease granted by Ferdinand Heyd on May 10, 1961, in favor of Shell. In 1929, Mr. Heyd and others granted Shell an oil and gas mineral lease that covered 320 acres; 160 of the 320 acres were owned by Mr. Heyd. Shell operated the mineral lease until 1985, when it transferred its interest in the lease to Rosewood Resources, Inc. (Rosewood). After granting Shell the oil and gas lease in 1929, Mr. Heyd granted Shell surface leases on various small parcels of his property. The 1961 lease encompassed all of the previously leased parcels and additional acreage, covering 120 acres of Mr. Heyd's property that was subject to the oil and gas lease. After Shell obtained the 1961 surface lease, it built an oil terminal on a five acre parcel within the leased acreage which it operated until March 1993.
The surface lease expired May 10, 1991. On May 9, 1991, Plaintiffs sent Shell a letter regarding the lease's termination date. In that letter, Plaintiffs also notified Shell that it had breached the lease agreement by disposing of saltwater on the property and by failing to maintain the property as provided in the lease. For approximately sixteen or seventeen months, Plaintiffs and Shell attempted to resolve these issues.
In May 1992, Plaintiffs filed suit against various parties to recover damages for trespass on the leased premises after expiration of Shell's lease, for the unauthorized disposal of saltwater on the leased premises, and for the poor condition of the leased premises. They also sought exemplary damages pursuant to La.Civ.Code art. 2315.3. Shell was named as a defendant in October 1992. It filed a third party demand against Rosewood. Plaintiffs named Rosewood as a defendant on its main demand, but settled with it on September 1, 1999. As part of the settlement, Plaintiffs agreed to defend and indemnify Rosewood with regard to Shell's claims against it. Shortly before trial, Shell's third party claim against Rosewood was dismissed on a motion to recuse its counsel on the basis of a conflict of interest. Shell appealed the dismissal. This court reversed the trial court's dismissal of Rosewood. Corbello v. Iowa Prod. Co., 00-1403 (La.App. 3 Cir. 6/6/01); 787 So.2d 596, writ denied, 01-2334 (11/16/01); 802 So.2d 615.
In May 2000, Plaintiffs tried their claims to a jury. At the conclusion of the two and one-half week trial, the jury awarded Plaintiffs damages in the amounts of $927,000.00 for Shell's failure to vacate the leased premises after the surface lease expired; $33 million to restore the leased premises to its 1961 condition; and $16,679,100.00 for Shell's illegal disposal of saltwater on the leased premises. Pursuant to post-trial motions, Plaintiffs were awarded $689,510.00 in attorney fees and expert fees were set at $65,000.00; the trial court reduced the jury's award of $927,000.00 for failure to vacate the leased premises to $32,500.00. This appeal followed.

Standard of Review
In Lasyone v. Kansas City Southern Railroad, 00-2628, pp. 5-6 (La.4/3/01); 786 So.2d 682, 688-689, the supreme court reviewed the standard of review applicable to findings of fact:
A trial court's finding of fact may not be reversed absent manifest error or unless clearly wrong. Stobart v. State of Louisiana, Through Department of Transportation and Development, 92-1328 (La.4/12/93), 617 So.2d 880. The reviewing court must do more than just *38 simply review the record for some evidence which supports or controverts the trial court's findings; it must instead review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart, 617 So.2d at 882. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Id. The reviewing court must always keep in mind that "if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Stobart, 617 So.2d at 882-83, citing Housley v. Cerise, 579 So.2d 973 (La.1991) (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990)).
These standards for manifest error review are not new. They are the guiding principles that aid our courts of appeal, which are our error correcting courts, when reviewing a trial court's factual determinations. A manifest error review is applicable to the fact-driven determinations of the present case.
The assessment of damages by a jury is a determination of fact. On appeal, we "review the exercise of discretion by the trier of fact." Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). We cannot disturb an award of damages by a jury unless the trier of fact abused its discretion in making the award.

Trespass
Plaintiffs assign as error the trial court's reduction of the jury's $927,000.00 award to $32,500.00. The surface lease terminated May 10, 1991. Plaintiffs' letter dated May 9, 1991, notified Shell of the expiration date of the lease. For a period of time following its expiration, plaintiffs discussed with Shell the possibility of renewing the lease. Shell remained on the premises during that time. In October 1992, Plaintiffs named Shell as a defendant in their lawsuit. In February 1993, Shell closed the oil terminal and moved from the premises, having remained twenty-two months after the lease terminated. Plaintiffs contend they would not agree to re-lease the property to Shell without knowing the profits Shell derived from the oil terminal during the course of the lease. Shell would not provide that information.
Plaintiffs presented evidence of Shell's profits from its operation of the oil terminal after the lease expired, i.e., the $927,000.00 awarded by the jury. Shell presented evidence of the annual rental value of the three acres on which the terminal was situated, $265.50, as well as the annual rental value of the access road to the terminal, $168.00. No other evidence regarding rental was presented.
Post-trial, Shell filed a motion for judgment notwithstanding the verdict for new trial and/or for remittitur, alleging in part that the jury's award for its remaining on the leased premises after termination of the lease was improper. After a hearing on the motion, the trial court denied the motion for JNOV and the motion for new trial. It also denied the motion for remittitur, except as to the claim for trespass, reducing the $927,000.00 award to $32,500.00. Plaintiffs argue that the trial court committed error when it granted the remittitur without giving them the option to choose a new trial on the issue.
Article 1814 of the Code of Civil Procedure provides that a "remittitur ... is to be entered only with the consent of the plaintiff ..., as an alternative to a new *39 trial, and is to be entered only if the issue of quantum is clearly and fairly separable from other issues in the case." In Miller v. Chicago Insurance Co., 320 So.2d 134, 136 (La.1975), the supreme court addressed the issue of consent with regard to a request for an additur or remittitur, stating:
The Louisiana statutory scheme requires the consent of the party adversely affected by an additur or remittitur. The party is offered an opportunity, when asked by the trial judge, to agree to a change in the judgment, thereby avoiding the expense and delay of a new trial. The order of an additur or remittitur is therefore contingent; if the party does not agree to the change, he elects to submit to a new trial.
There is no transcript of the hearing on the motions for JNOV, new trial, or remittitur in the record. Nothing in the record indicates that Plaintiffs were given the opportunity to choose a new trial on the issue, rather than the remittitur. Accordingly, we conclude that the trial court committed error when it granted the remittitur.
Plaintiffs next argue the jury's award of $927,000.00 should be affirmed because they are entitled to the profits earned by Shell while it remained on the property without a lease. The basis of their argument is the holding in Rosenthal-Brown Fur Co. v. Jones-Frere Fur Co., 162 La. 403, 410, 110 So. 630, 632 (1926), where the court stated:
[O]ne who unlawfully, and against the will of the owner of the land, exercises thereon rights belonging exclusively to the owner, must account to such owner for all the fruits of his unlawful exercise of that right (Gulf Refining Co. v. Hayne, 148 La. 340, 346, 86 So. 891; R.C.C. 501; Allies Oil Co. v. Ayers, 152 La. 19, 21, 22, 92 So. 720); this being in accord with the moral maxim of the law that `no one ought to enrich himself at the expense of another.' R.C.C. 1965.
In Rosenthal-Brown, the defendants were found to be in bad faith, "both in fact and in law," when they trapped animals on land they knew was leased to the plaintiff. Id. The court concluded that if the directors of the company had not had personal knowledge of the lease, it became aware of the lease when an injunction suit was filed against it by the plaintiff before the trapping season opened. The court described the defendants' profits as "the ill-gotten gains of their unlawful act, done to the manifest prejudice of plaintiff's right," which had to be restored to the plaintiff. Id. at 633. Pursuant to Rosenthal-Brown, whether a possessor must account for profits depends on whether or not he is in good faith or bad faith. A good faith possessor does not have to return profits; a bad faith possessor must. However, even the bad faith possessor is entitled to a credit for expenses incurred in producing his profits.
For us to conclude that the jury's award of $927,000.00 should be sustained, we must find Shell to be a bad faith possessor. Plaintiffs argue Shell was a bad faith possessor because it remained after receiving notice to vacate. However, after sending the notice to vacate, Plaintiffs continued to discuss renewal of the lease with Shell. Prior to naming Shell as defendant herein on October 8, 1992, five months after they filed their original petition, there is no evidence that Plaintiffs instructed Shell to vacate the premises. Under these facts, we cannot say that Shell was a bad faith possessor for the entire time that it remained on the property after the expiration of the lease. Rather, we find Shell was a good faith possessor until it was named as a defendant in Plaintiffs' suit. Thereafter, it was a bad faith possessor. *40 Accordingly, the jury's award was improper.
Having found Shell to be a good faith possessor for a period of time following the expiration of the lease because of the negotiations for a new lease, we address Plaintiffs' claim that the trial court committed error when it allowed Shell to introduce evidence of the negotiations. Evidence of settlement negotiations "is not admissible to prove liability for or invalidity of the claim or its amount," but such evidence need not be excluded when it "is offered for another purpose." La.Code Evid. art. 408(A). The negotiations were not admitted to prove Shell's liability for remaining on the property after the lease expired; they were admitted to show that Plaintiffs and Shell tried to reach an agreement on a new lease after the 1961 lease expired. No evidence of the possible lease terms discussed by the parties, including a rental rate, was allowed. It was not error to allow evidence of these negotiations.
For the period of time that Shell was in good faith, Plaintiffs are not entitled to Shell's profits as damages, and Shell's proposition that they should be paid a rental of $265.50, plus $168.00 for access to the property, is unacceptable. Different methods are used to establish commercial rental rates and terms. Some commercial leases provide for rent which is composed of a base rental rate with a percentage of the lessee's profits or an additional charge for particular products sold. See, e.g., Sewell v. Huey, 00-385 (La.App. 4 Cir. 1/24/01); 779 So.2d 1003; Kleiser, Inc. v. Airport Comm'n of Airport Dist. No. 1 of Jefferson Davis Parish, 93-1513 (La.App. 3 Cir. 6/1/94); 640 So.2d 751. In other commercial leases, the rental rate is a percentage of the lessee's profits. See, e.g., Home Distrib., Inc. v. Dollar Amusement, Inc., 98-1692 (La.App. 1 Cir. 9/24/99); 754 So.2d 1057; Caballero Planting Co., Inc. v. Hymel, 97-1646 (La.App. 1 Cir. 6/29/98); 713 So.2d 1277, writ denied, 98-2035 (La.11/6/98); 728 So.2d 391. There is no evidence in the record regarding what type of lease and rental rate would be appropriate in this situation.
For the period of time that Shell possessed in bad faith, Plaintiffs damages are Shell's profits from its operations on the premises. While the record contains documentation concerning Shell's earnings and expenses after the termination of the lease until it exited the premises, we are unable to calculate, with the required exactness, its net profit for that period.
For these reasons, this issue is remanded to the trial court for further proceedings in accordance with this opinion.

Saltwater Disposal

Authorized or Unauthorized?
Shell argues that the 1961 lease authorized it to install and operate saltwater disposal facilities on the leased property to dispose of saltwater produced by it and other producers in the Iowa Field. The purpose of the lease is set out in paragraph two which provides:
The purpose of this lease is to grant to LESSEE the exclusive use (except as hereinafter provide) of the above described land to erect, maintain, use, operate, and replace thereon such buildings, structures, tanks, separators, meters, pumps, pipes and pipe lines, telephone and electrical transmission lines, and other facilities, installations or equipment as may be necessary or useful in the general conduct of LESSEE'S business in the Iowa Field and/or other fields, including, without limitation, the producing, handling, storing, treating, processing and transporting of liquid and/or gaseous hydrocarbons and the products thereof, or other substances, without restriction as *41 to source, ownership or destination thereof. Without limitation of the foregoing, LESSEE shall have the right to use the above described premises for the disposal of salt water produced by it from its mineral leases or leases operated by it in the Iowa Field, or extensions thereof, whether such salt water be produced during operations on land owned by LESSOR or land owned by others. Disposal of salt water may be by surface storage or by injection into subterranean salt water bearing formation(s), or by both methods. In disposing of such salt water, LESSEE may utilize existing disposal wells on the above described land, drill new wells and/or convert oil wells thereon, and may construct, dig, lay and maintain on said land such pits, tanks, pipe lines, facilities and other structures for the handling and storage of such salt water as it may deem necessary.
Shell argues the trial court committed error when it interpreted the lease to limit its authority to dispose of saltwater. Alternatively, Shell argues that the lease is ambiguous and that the court erred in taking the question from the jury.
Whether a contract is ambiguous is a question of law. Bartlett Constr. Co., Inc. v. St. Bernard Parish Council, 99-1186 (La.App. 4 Cir. 5/31/00); 763 So.2d 94, writ denied, 00-2322 (La.11/3/00); 773 So.2d 142; Slocum-Stevens Ins. Agency, Inc. v. Int'l Risk Consultants, Inc., 27,353 (La.App. 2 Cir. 12/11/95); 666 So.2d 352, writ denied, 96-102 (La.3/8/96); 669 So.2d 399. "The interpretation of an unambiguous contract is also a question of law." Slocum-Stevens Ins. Agency, Inc., 666 So.2d at 357. If the terms of a contract are unambiguous:
[T]he meaning and intent of the parties to the written contract must be sought within the four corners of the instrument and cannot be explained or contradicted by parol evidence. Contracts, subject to interpretation from the instrument's four corners without the necessity of extrinsic evidence, are to be interpreted as a matter of law, and the use of extrinsic evidence is proper only where a contract is ambiguous after an examination of the four corners of the agreement.
Natali v. Froeba, 98-1354, p. 4 (La.App. 3 Cir. 3/3/99); 735 So.2d 30, 32, writ denied, 99-1442 (La.9/17/99); 747 So.2d 1106 (citations omitted), quoting Hampton v. Hampton, Inc., 97-1779, pp. 5-7 (La.App. 1 Cir. 6/29/98); 713 So.2d 1185, 1188-90. Appellate review of a question of law is simply to determine whether the trial court was legally correct. Weeks v. T.L. James & Co., Inc., 626 So.2d 420 (La.App. 3 Cir.1993), writs denied, 93-2909, 2936 (La.1/28/94); 630 So.2d 794.
The trial court correctly determined and instructed the jury that the lease limited Shell's disposal of saltwater on the leased premises to saltwater produced by Shell on the Heyd lease or on other leases in the Iowa Field. The lease provision quoted above begins with a general grant of authority, which is followed by a provision that specifically governs the disposal of saltwater. "In the interpretation of statutes and contracts, the specific controls the general." Mixon v. St. Paul Fire & Marine Ins. Co. of St. Paul, Minn., 147 La. 302, 306, 84 So. 790, 791 (La.1920). Therefore, the two sentences that address saltwater disposal define Shell's rights under the lease regarding saltwater disposal. The provisions are unambiguous, as they clearly set forth what saltwater Shell can dispose of on the leased premises: saltwater produced by it on the Heyd property or any other property in the Iowa Field. Disposal of saltwater produced in the *42 Iowa Field by anyone other than Shell was not authorized and disposal of saltwater produced by Shell anywhere other than the Heyd property or in the Iowa Field was not authorized.
These assignments are without merit.

Calculation of Damages
Shell next argues that the jury's $16,169,000.00 award for its unauthorized disposal of saltwater was improper. First, it argues the award was improper under La.Civ.Code art.1995, which provides that an obligee's damages for breach of contract are his lost profits. It reasons that because Plaintiffs' family never operated a disposal system on this property they have no lost profits and are not entitled to damages.
"It is well settled that the same acts or omissions may constitute a breach of both general duties and contractual duties and may give rise to both actions in tort and actions in contract." Ridge Oak Dev., Inc. v. Murphy, 94-25, p. 4 (La.App. 4 Cir. 6/30/94); 641 So.2d 586, 588, writ denied, 94-2565 (La.12/16/94); 648 So.2d 389. In such a situation, the plaintiff has the right to seek damages in either tort or contract. Certain Underwriters at Lloyd's, London v. Sea-Lar Management, Inc., 00-1512 (La.App. 4 Cir. 5/9/01); 787 So.2d 1069. Plaintiffs have the right to recover damages for breach of contract or tort; they are not limited to damages under Article 1995.
With this in mind, we consider our role in the review of a jury's award of general damages, as set forth in Youn, 623 So.2d at 1261:
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Shell argues that the lease agreement provided for the disposal of saltwater on the premises and that their breach of this provision did not result in significant amounts of additional saltwater being disposed of on the premises when compared to the amounts of saltwater disposed of pursuant to the terms of the lease. This argument ignores the fact that it breached the lease and Plaintiffs are entitled to be compensated for that breach.
Plaintiffs argue that the proper measure of damages for Shell's unauthorized disposal of saltwater is the money it saved from not having to dispose of the saltwater at a commercial disposal facility. Plaintiffs presented the testimony of William D. Griffin, who was accepted as an expert in petroleum engineering, specifically, drilling, reservoir production, and marketing with economic evaluation and safety, on this issue. Mr. Griffin outlined for the jury Shell's activities on the leased property, explaining its operations on the premises throughout the years, including its oil terminal. At the oil terminal, Shell accumulated oil from various sources, not just oil it produced in the Iowa Field, and stored it at the terminal. Oils of different weight and grade were mixed together at the terminal to obtain a higher price for the oil. Mr. Griffin described the terminal as a profit center for Shell.
Mr. Griffin identified four sources of the saltwater that was improperly disposed of on the Heyd property: 1) Shell's gas plant; 2) Shell's Kings Bayou Field in Grand Chenier, Louisiana; 3) a Hawthorne Co. *43 lease in the Iowa Field; and 4) a neighboring gas plant owned by Mobil. He determined from records maintained by the Department of Conservation and Shell that 169,079 barrels of saltwater from Shell's Kings Bayou Field, 478,830 barrels of saltwater from a lease operated by Hawthorne Co., and 132,898 barrels of saltwater from a nearby gas plant operated by Mobil were improperly disposed of on the property. Shell's expert, Calvin Barnhill, testified that Mr. Griffin's testimony was substantiated by the evidence.
The parties completely disagree on whether saltwater was produced by Shell's gas plant. Mr. Griffin testified that the gas plant produced saltwater. Shell argues that it did not. There were no records documenting saltwater produced at the plant. Mr. Griffin visited the site over fifty times and visited other gasoline plants to form an opinion as to how much saltwater was produced by the plant and disposed of on the property. For the years 1956 through 1976, he calculated that Shell improperly disposed of 848,916 barrels of saltwater produced by its gas plant. With regard to the disposal of saltwater from the gas plant in the years 1956 to May 9, 1961, he explained that Shell's disposal of saltwater from its gas plant, which was not the result of its own gas production in the Heyd Field, was not authorized by the 1929 oil and gas lease.
Mr. Griffin described the process of separating oil and gas as it was produced from the well. In the field separation process, the separated gas went from the separator to Shell's gas plant. At the gas plant, another separation process was performed to insure that water, which can damage the gas plant compressor, was removed. Mr. Griffin's opinion was based in part on his experience with field separators which, he testified, remove water from gas at an efficiency which is usually above 90%. With regard to these particular separators, he testified that he adopted the representation of Mr. Richard Jones, a Shell employee, that Shell's separator operated at 98% efficiency.
Mr. Griffin's opinion was also based on the operation of a gas plant at Egan, Louisiana, which he considered similar to Shell's gas plant. He testified that he visited the Egan plant and compared the volumes of gas that went through the plant to determine how much water was removed from each volume of gas. Mr. Griffin then reviewed gas processing agreements between Shell and other producers, as well as other related documentation, to calculate that 848,916 barrels of saltwater produced at the Shell plant and disposed of on the Heyd property was from gas not produced on the property. In his opinion, his calculation based upon the Egan plant was less than the saltwater actually produced by the Shell gas plant.
Shell asserts that Plaintiffs did not establish that any saltwater from the gas plant was disposed of on the property, arguing that no evidence supports Mr. Griffin's opinion on this issue. It argues that his testimony was mere speculation and that it was error for the jury to accept his testimony on this issue. Shell presented testimony on this issue. Austin Stutzman was employed by Shell for forty-five years. He worked at the Iowa gas plant for thirty-nine of those years, retiring in 1976. He testified that there was very little water from the gas plant and that there were no lines that ran from the gas plant to the disposal plant. Mr. Thomas "Buster" Brashear went to work for Shell in 1962. He worked in the Iowa Field as a lease operator and, as part of his duties, worked on the field separators. He testified that there was no water or any type of fluid going with the gas from the separators *44 to the gas plant, stating "it just didn't happen."
Mr. Barnhill was recognized as an expert in petroleum engineering with a specialty in oil and gas operations, production operations, saltwater disposal operations, and petroleum economics. He disagreed with Mr. Griffin that the gas plant produced saltwater. Based on conversations he had with the person in charge of the Egan plant for the years 1971-1976, he found Mr. Griffin's analogy between the Egan plant and the Heyd plant unreasonable. He also disagreed with Mr. Griffin's opinion that the separators' efficiency on the Heyd property was 98%, explaining that while the gas which exits the gas leg of a properly operating three-phase separator will contain water vapor, it is "for all practical purposes water-free" and would not have had any free water in it. He testified that his opinion was based upon his working knowledge of separators and gas plants, as well as the testimony of Shell employees that they did not have to deal with water on a routine basis. His final opinion was that very little water got through the separator to the gas plant.
Throughout the course of the trial, Plaintiffs put Shell's credibility at issue. They established that Shell had retained experts years before this lawsuit was filed, who had done testing and made recommendations in this matter and were available for trial. However, Shell retained different experts within months of the trial and presented their testimony only. The jury may have concluded that Shell had something to hide or that the previously-retained experts' testimony would be detrimental to its position. Specifically, Shell did not call Richard Jones, the Shell employee who allegedly told Mr. Griffin that the field separator on the Heyd property had an efficiency of 98%, as a witness to refute making the statement to Mr. Griffin or its accuracy. Last, Plaintiffs' experts made many more site visits than Shell's experts did.
Mr. Griffin's testimony was lengthy and detailed. He was cross-examined extensively by Shell. We do not find his opinions and calculations mere speculation as argued by Shell and cannot say that the jury's acceptance of his testimony was unreasonable.
When [a jury's] findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.
Lirette v. State Farm Ins. Co., 563 So.2d 850, 852-53 (La.1990) (citations omitted). Unless an expert's reasons are patently unsound, this rule applies also to expert testimony. We find no error with the jury's acceptance of Mr. Griffin's testimony on this issue.
Plaintiffs also presented Mr. Griffin's testimony on the issue of damages. In his opinion, Shell's cost to dispose of the unauthorized saltwater elsewhere was an appropriate valuation of their damages. He calculated that cost to be $1 per barrel, which included transportation to a disposal site. This translated into $1,629,723.00 in damages. He testified that it cost $1.00 per barrel, as of 1999, to dispose of saltwater from Kings Bayou. He further testified that, in his experience, disposal costs were the same or lower in 1999, than they were in the 1970s.
Mr. Barnhill testified that Mr. Griffin's $1.00 per barrel for disposal cost would have made the Heyd Field uneconomical to operate and it would have been shut in. Further, he calculated that only 712,634 *45 barrels of saltwater were improperly disposed of by Shell. In his opinion, $.05 per barrel with a minimum of $2,000.00 not to exceed 4% of the revenue of the well was an appropriate disposal cost. He based his opinion upon the amount the State of Louisiana, the largest landowner in the state, charges for disposal. For these reasons, we find no error with the jury's acceptance of Mr. Griffin's testimony, rather than Mr. Barnhill's, on the issue of damages.

Prescription
Shell argues that the Plaintiffs' claims for damages due to its activities on the leased premises more than ten years before they filed their lawsuit are prescribed. The trial court determined that the claims were not prescribed, concluding that Shell's actions on the Heyd property constituted a continuing tort. "[T]he theory of continuing tort ... requires that the operating cause of the injury be a continuous one which results in continuous damages." Crump v. Sabine River Auth., 98-2326, p. 7 (La.6/29/99); 737 So.2d 720, 726. Shell's activities on the leased premises, which violated the lease and damaged the property, were a part of the daily operation of the oil and gas lease and the gas plant. We find no error with the trial court's conclusion that its actions constituted a continuing tort and were not prescribed.

Saltwater Disposed of by Others
Shell argues that it cannot be held responsible for the unauthorized disposal of saltwater on the Heyd property by anyone other than itself. This argument only concerns the saltwater from the Mobil gas plant that was disposed of on the property from 1985 until 1992. It amounts to approximately 100,000 barrels of saltwater.
The jury awarded $16,679,100.00 for Shell's unauthorized disposal of saltwater on the Heyd property. Plaintiffs presented evidence that 1,629,723 barrels of saltwater were improperly disposed of on their property. Dan Cliffe, their expert economist, calculated the present day value of $1,629,723.00 using two different methods. The first method represented investing this amount in the Standard & Poor 500 for a present value (time of trial) of $28,031,108.00. The second method was a calculation which factored inflation only; it did not compute any return on investment for a present value (time of trial) of $6,908,324.00. The jury did not award either of these amounts. Accordingly, we cannot determine from the amount of the award whether it does or does not include saltwater from the Mobil gas plant.
Additionally, we note that the authority to dispose of saltwater on the premises was granted in the 1961 surface lease. The oil and gas lease that Shell assigned to Rosewood in 1985 did not include saltwater disposal rights. On cross-examination, Mr. Barnhill testified that Rosewood, or another operator, could not have performed its operations in the Iowa Field without access to the disposal system and agreed that Shell was not forced to sell its mineral lease to Rosewood. He also agreed that Shell knew that by retaining the surface lease it remained obligated under the lease, testifying, "I would have assumed that if I sold the oil and gas and mineral lease to Rosewood, basically those operations would go to Rosewood.... If I retained the surface lease, then I would be responsible for the provisions of the surface lease." Plaintiffs also pointed out through Mr. Barnhill's testimony that Shell did not instruct Iowa Production, the operator on the Heyd property at the time, to cease using the saltwater disposal facility because it had no right to use it until July 1991.
This assignment is without merit.

*46 Restoration of the Leased Premises

Shell asserts numerous reasons why the jury's restoration award of $33 million was improper. Paragraph 2 of the surface lease outlines Shell's use of the property and includes "without limitation the producing, handling ... liquid and/or gaseous hydrocarbons." Paragraph 8 provides that Shell "will reasonably restore the premises as nearly as possible their present condition" and that it will indemnify the Heyds from damage "of every kind and nature that may be caused by its operations or result from the exercise of the rights or privileges" granted by the lease.
We begin with Shell's argument that the jury's damage award was improper because it did not consider the "wear and tear" provided for in La.Civ.Code art. 2719. Under this article, an allowance for "wear and tear" is made only when an inventory was made "at the time of the lease." No inventory was made at the time of the lease was entered; therefore, the exception does not apply. See Guidry v. Midgett, 488 So.2d 1323 (La.App. 3 Cir. 1986). Pursuant to La.Civ.Code art. 2720, Shell was presumed to have received the leased premises in "good order" and was obligated to return it to the Heyds "in the same state" at the conclusion of the lease period. Additionally, the lease provided that Shell would "reasonably restore the premises to their present condition" making no exception for "wear and tear." "[T]he codal articles and statutes defining the rights and obligations of lessors and lessees ... regulate the relationship between lessor and lessee when there is no contractual stipulation imposed by the lease." Tassin v. Slidell Mini-Storage, Inc., 396 So.2d 1261, 1264 (La.1981). Article 2719's exception for "wear and tear" does not apply.
Now, we must determine whether the jury's award for restoration was reasonable. Shell cites Roman Catholic Church of the Archdiocese of New Orleans v. Louisiana Gas Service Co., 618 So.2d 874 (La. 1993) in support of its argument that the award cannot stand. In that case, one unit of a housing complex was destroyed by fire. The Archdiocese sued to recover the cost of restoring it. The defendant argued that the cost of restoration of the unit was so disproportionate to its market value that the Archdiocese could only recover the lesser amount. The supreme court announced a general rule applicable in such situations: the owner can only recover the difference between the value of the property before and after the damage. Id. However, the court recognized three exceptions to the general rule: 1) there is a reason personal to the owner for restoring the property to its original condition; 2) there is reason to believe the owner will restore the property to its original condition; or 3) the owner has already restored the property to its original condition. Id.
Plaintiffs' expert on restoration was Austin Arabie, an environmental scientist with a specialty in soil and ground water science, including contamination of soil and groundwater by oilfield products and remediation of property contaminated by oilfield waste. As with Mr. Griffin, Mr. Arabie's investigation of the site was extensive. He visited the site on at least thirteen occasions and collected numerous samples. His testimony included information regarding previous investigations conducted by Shell in 1984, 1991, and 1992, which revealed significant numbers of hydrocarbons, oil and grease, high levels of salt, high electrical conductivity levels, benzene, and heavy metals in the soil and water. He testified that Shell made two attempts to clean small areas of the premises and that its own expert recommended remediating the soil down to three feet; *47 however, no remediation was done. He also testified that Shell's expert agreed in deposition that it was possible the drinking water source might be contaminated, but testified that he did not think Shell should notify anyone unless someone complained. The expert, Dr. Lloyd Duell, was one of the experts Shell employed prior to trial, but did not call as a witness at trial. Apparently, he was in the courtroom throughout the trial; however, he was not called to testify regarding his findings or to dispute the statements attributed to him by Mr. Arabie. In fact, Shell did not attempt to impeach Mr. Arabie's testimony in this regard.
With regard to the amount of contaminants on the property and the level of the individual contaminants, like salt, Mr. Arabie testified that toxicity is largely a function of dose. In his opinion, the contamination of the property poses a threat to the Chicot Aquifer, which is the source of drinking water for that area, explaining that because of the depth of the contamination and the nature of the clays between the contamination and the aquifer the contamination may travel into the aquifer. He described the clays in the area of the premises as "fractured," i.e., the layer of clay below the soil on the premises dries very hard and fractures. The resulting cracks might allow liquids from the level above where there is contamination to travel into the aquifer. He pointed out that Dr. Duell did not rule out that the drinking water was contaminated; rather, he simply did not perform enough testing to make that determination.
During his investigation, Mr. Arabie performed electromagnetic testing which Shell did not do. This testing revealed that there was material buried down to twelve feet on the premises, including a very old gasoline dispensing tank at five feet; an old barrel labeled triethylene glycol that had been crushed and dumped; old tires and sludge out of a buried drum at two and one-half to three feet; above ground tanks; a 500 gallon tank with piping on the side; an old well sign; as well as the contaminants his testing identified. He testified that the surface of the premises would not support vegetation, including one of the areas that Shell claimed it had remediated.
Mr. Arabie testified that cleanup of the premises would require removal of the sources of contamination at a cost of $5 million, installation of a groundwater recovery system at a cost of $3 million, and operation of the recovery system and disposal of the contaminated ground water at a cost of $1.3 million per year for a minimum of five years. His minimum estimate for restoration was $15 million. He testified that an additional $24 million would be necessary for a twenty year clean up. Even if his recommendations were implemented, he was unsure that the surface could be restored "as nearly as possible" to their 1961 condition as required by the lease because of the extent of the damage and the large area of the property.
Shell's experts testified that much less was required to restore the premises to their 1961 condition. Dr. Brad Drory, an expert in toxicology, risk-assessment, risk-based remediation, fate and transport of constituents in the subsurface, made one visit to the site, approximately one month before trial. He studied Dr. Duell's and Mr. Arabie's information. As a toxicologist, he found the site to be safe; the groundwater did not require remediation or cleanup. While he admitted that some housekeeping needed to be done to some of the visibly contaminated areas of the premises, his final opinion was that the site was protective, i.e., the contaminants in the ground would not cause further problems and nothing was required to make *48 the property safe. He admitted that his assessment of the property was based upon state regulations governing evaluation of contaminated sites, not the lease provisions.
Michael Pisani, an expert qualified as an environmental engineer with expertise in the assessment of soil contamination, groundwater contamination, contaminant movement, water movement, clean-up and regulatory standards, and hydrology, also testified on behalf of Shell on this issue. Mr. Pisani disagreed with Mr. Arabie's opinion that clays between the groundwater levels and the Chicot Aquifer are fractured clay, explaining that the clay beneath the Heyd property is very tight. He further testified that there is a lower zone of clay that never dries out; therefore, it doesn't crack. According to him, there is no pathway down to the Chicot Aquifer. He also testified that Mr. Arabie's testing was not representative of the entire site because he looked for particular things on top of the soil to determine where to sample.
The only concern Mr. Pisani found on the property was salt for which there is no prescribed clean-up level. He testified that the salt levels on the property were not in toxic concentrations and did not pose an environmental concern for the Chicot Aquifer. In his opinion, salt was only a concern at the surface because it was killing and stunting vegetation.
Mr. Pisani did testify that the buried materials should be removed from the property, which he estimated would cost $133,200.00. He also agreed that, if Plaintiffs were attempting to restore their property to a certain condition, he would have to know what the condition was when the contract was signed and he would monitor to insure that the contamination was removed. Finally, he testified that if it was his property, he would want it cleaned.
Donald Sagrera, an agricultural consultant, also testified on behalf of Shell. He was recognized as an expert in the field of agronomy, soil reclamation, including land affected by salt, assessment of soil damage, valuation of soil damage, soil restoration, and cost for application of restoration procedures. In rendering an opinion, he assumed that Plaintiffs wanted to end up with property they could farm. According to Mr. Sagrera, the property is situated in a rice-growing and cattle-producing area. He divided the property into thirteen different areas to perform testing for salt. Considering the salt content of the soil and the roads and installations on the property, he felt that rice or pasture would be the best crops for the property. In particular, he believed cattle production was the most feasible.
Mr. Sagrera's plan included draining and leveling the pits that remained on the property, hauling in six inches of soil, and plowing the entire tract. With regard to an eight acre area where a holding pit had been located, he testified that he would expect a 50% reduction in yield for the first year, then diminished reduction over the next five years to get to 100% production. In line with that, he testified that Plaintiffs should be compensated for the lost production in that area. He estimated $270,692.00 to restore the property: $51,392.00 for restoration of the pit area; $6,000.00 compensation for five years of reduced yields; $128,043.00 to eliminate existing vegetation in other areas of the property, mix the soil and even out the salt levels; $94,625.00 to remove plow lines; and, $20,119.00 for tree removal.
On cross-examination, it was pointed out that his plan did not include removal of the oil or grease on the premises. In response, Mr. Sagrera suggested that by working in those areas, the oil and grease would disintegrate. He also testified that *49 roots of the crops would only grow down six to eight inches, so salt below the surface at eighteen or twenty inches was insignificant for his purposes. His plan requires plowing the soil under eight to ten inches. He testified that it could take eight to ten years for the salt levels to finally play out. His recommendations did not address groundwater, and his estimates did not include removing the shell and gravel from the roads or removing boards or other junk, the contaminated soil, or the pipes on the premises.
As previously discussed, the jury saw and heard Plaintiffs' experts and Shell's experts' identify those things on the property that they considered to be problems, how they should be addressed, and the cost to address them. They saw photographs of the different items found buried under the surface of the property. None of Shell's experts' testimony addressed restoring the property to its 1961 condition; however, Mr. Sagrera testified that he thought his recommendations would render the property better than it was in 1961. We find no basis for concluding the jury committed manifest error in accepting Mr. Arabie's testimony and recommendations, including the award of $33 million in damages. The award was actually less than Mr. Arabie's recommended award, which was $15 million for immediate work and $24 million for monitoring for twenty years.
Furthermore, the award need not be reduced because we find that the terms of the lease made the condition of the property personal to its owners. Apparently, Mr. Heyd knew or suspected that Shell's operations on his property would be detrimental to it, and he sought to protect it by including in the lease the provision for restoration. There was also testimony by Mr. Arabie that he believed Plaintiffs would follow his recommendations to restore their property.
Shell also argues that the award is improper because it may have to pay twice if state regulatory agencies determine that there are conditions on the property which must be cleaned up. There is no evidence in the record which supports this argument. No agency has instituted an investigation of the property. We find no merit to this claim. See Allain v. Shell Western E & P, Inc., 99-403 (La.App. 1 Cir. 5/12/00); 762 So.2d 709.

Fault of Rosewood
Shell argues the jury's verdict is erroneous because it does not assign responsibility to Rosewood. The trier of fact's allocation of fault is a factual determination. Clement v. Frey, 95-1119 (La.1/16/96); 666 So.2d 607. Accordingly, an adjustment in an apportionment of fault will only be made if it is "clearly wrong," and only "to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion." Id. at 611. The jury had before it evidence of Shell's assignment of the oil and gas lease to Rosewood and Rosewood's activities on the premises after the assignment. It heard and considered Plaintiffs' expert testimony that the contamination on the property probably occurred before Rosewood's involvement and the testimony of Rosewood employees regarding their management of the property. The jury also considered the evidence of Shell's experts who opined that Rosewood's activities contributed to the condition of the property. There is nothing in the record that leads to the conclusion that the jury's conclusion on this issue is "clearly wrong."
This assignment is without merit.

*50 Exemplary Damages

Plaintiffs assign as error the trial court's determination that Shell's activities on the leased premises did not subject them to exemplary damages under La.Civ. Code art. 2315.3. Article 2315.3, which was repealed in 1996, allowed for punitive damages for injuries caused by the wanton or reckless disregard of public safety in the storage, handling, or transportation of hazardous or toxic substances. Shell argues that because "petroleum" is exempted from the definition of hazardous substance in La.R.S. 30:2272(4)(c) it is not a hazardous substance for purposes of Article 2315.3.
In Rivera v. United Gas Pipeline Co., 96-502, 96-503, 97-161 (La.App. 5 Cir. 6/30/97); 697 So.2d 327, writs denied, 97-2030 (La.12/12/97); 704 So.2d 1196 and 97-2031, 2032, 2034 (La.12/12/97); 704 So.2d 1197, and State Farm Fire and Casualty Co. v. Sewerage & Water Board of New Orleans, 97-1862 (La.App. 4 Cir. 2/25/98); 710 So.2d 290, the courts concluded that the exclusion of natural gas from the definition of "hazardous substance" in La.R.S. 30:2272 did not exclude it from the definition of hazardous or toxic substances within the meaning of La.Civ.Code art. 2315.3. We find the fourth circuit's discussion on the issue in State Farm persuasive.
In State Farm, the defendants made the same argument urged by Shell herein, i.e., that La.R.S. 30:2272 and Article 2315.3 should be read in pari materia. In addressing the argument, the court stated:
Clearly, the Legislature explicitly excluded natural gas from the scope of Chapter 12, entitled "Liability for Hazardous Substance Remedial Action" and limited the applicability of the general definition of "[h]azardous substance" in LSA-R.S. 30:2272. However, the Legislature also explicitly limited the definition ascribed to the term "[h]azardous substance" to the parameters of Chapter 12. Moreover, the exception expressly announced in LSA-R.S. 30:2272(4)(c) does not grant this court license to disregard the rule requiring plain meaning announced by Article 11 of the Louisiana Civil Code for interpretation of terms used in LSA-C.C. art. 2315.3 and imply an exception where none exists. Finally, assuming again that the definition of "[h]azardous substance" provided by LSA-R.S. 30:2272 determines the issue [of] what are "hazardous ... substances" for LSA-C.C. art. 2315.3, the defendants have failed to address the issue whether natural gas is included within the definition of "toxic substances". Thus, defendants' argument, for interpretation of Article 2315.3 in pari materia LSA-R.S. 30:2272(4)(c) only lacks merit.
Id. at 292-93 (citation omitted).
If the phrase "[a]s used in this Chapter" is not interpreted in the manner described in State Farm, it would be superfluous and serve no purpose in the statute, which would contravene the presumption that each word in a statute is to be given meaning. Losabia v. Cypress Hosp., 619 So.2d 151 (La.App. 3 Cir.), writ denied, 625 So.2d 1047 (La.1993).
We are aware of the supreme court's decision in Chustz v. J.B. Hunt Transport, Inc., 95-356 (La.11/6/95); 662 So.2d 450, where it granted summary judgment and dismissed the plaintiffs claims for exemplary damages, holding that petroleum lubricating oil was not a toxic or hazardous substance under La.Civ.Code 2315.3. We note: 1) the decision was a per curiam opinion that did not address the issue presented herein; 2) the decision was rendered before either Rivera or State Farm; and, 3) the supreme court denied writs in State Farm. For these reasons, the decision *51 does not support Shell's position herein.
In Chustz, the court did define hazardous and toxic substances:
Hazardous substances are those that present substantial danger to public health or the environment. A toxic substance is a substance poisonous to living organisms. Thus, the terms "hazardous" and "toxic" refer to substances which cause injury or death to human beings and/or create an environmental hazard. Applying strict construction, under the facts here cases of petroleum lubricating oil are not hazardous or toxic.
Id. at 451. Based upon the evidence in the record, a jury could find that some of the substances on Plaintiffs' property meet this definition.
We conclude that petroleum is not exempted from Article 2315.3 and that Plaintiffs are entitled to present their claims on this issue to a jury. As a result of the trial court's determination that Plaintiffs were not entitled to claim exemplary damages, they proffered the deposition of their expert on the issue. However, Shell did not introduce any evidence on the issue. Without evidence of Shell's position on this issue, we cannot address it. Therefore, this issue is remanded to the trial court for further proceedings.

Attorney Fees
The surface lease provides that the prevailing party in a suit under the lease is entitled to recover "reasonable attorney fees." Following the trial, Plaintiffs filed a motion to have their attorney fees set. After a hearing, the trial court awarded attorney fees in the amount of $689,510.00. Plaintiffs argue that the award was too low. The supreme court in State, Department of Transportation and Development v. Williamson, 597 So.2d 439, 441-42 (La.1992) (citations omitted) (footnote omitted) set out the factors to be considered by a court in reviewing an award of attorney fees:
Courts may inquire as to the reasonableness of attorney fees as part of their prevailing, inherent authority to regulate the practice of law.... Factors to be taken into consideration in determining the reasonableness of attorney fees include: (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) amount of money involved; (5) extent and character of the work performed; (6) legal knowledge, attainment, and skill of the attorneys; (7) number of appearances made; (8) intricacies of the facts involved; (9) diligence and skill of counsel; and (10) the court's own knowledge.
Two of the five Plaintiffs contracted with their attorney for an hourly rate, while the remaining three contracted their attorney for a contingency fee of 33%. The trial court awarded attorney fees based upon an average hourly rate of $188.00 per hour for the attorneys and $70.00 per hour for their paralegals. The total number of attorney hours was 2,895 and paralegal hours was 2,075. Plaintiffs argue attorney fees should be awarded pursuant to their contracts with their counsel, i.e., 20% of the verdict, representing 5/8 of a 1/3 contingency fee, and 37.5% of the hourly fees shown on the time records, representing the remaining 3/8. The trial court refused to award attorney fees based in part upon the contingency contract of three of the Plaintiffs with their counsel because Shell did not participate in the "assumption of the risk" associated with a contingency fee contract. According to the court, the terms of a contingency fee contract would not be reasonable under the terms of the lease.
*52 We recognize that a trial court has great discretion in determining an award of attorney fees. However, under the circumstances of this case, we find the award to be abusively low. Even so, we do not find Plaintiffs' proposal acceptable either. The type of contract the prevailing party has with its attorney is a factor we must consider, but it is not the determining factor. Moody v. Arabie, 498 So.2d 1081 (La.1986).
We must consider all of the factors identified in Williamson to establish an appropriate fee. A review of the Williamson factors reveals: Plaintiffs' counsel's work in this case resulted in a $50 million award in favor of their clients; it involved great responsibility by the attorneys to prepare and carry the case through trial; the litigation is more likely than not the greatest monetary issue their clients will face in their lifetimes; Plaintiffs' counsels' presentation of the case reflect the tremendous effort, skill, and knowledge required of them; the character of the work and the attorneys themselves are also reflected therein; the trial itself lasted eleven days; the volumes of exhibits and the length of the trial are just a small reflection of the time required for preparation of the matter for trial; the facts of the case were not extremely complicated, but the evidence to establish Plaintiffs' claims was extensive requiring much investigation, diligence and skill of counsel; this matter was factually and legally intensive; and the court's own knowledge of the law was supplemented by counsel throughout the trial.
Shell's breach of the lease agreement is the reason it is in court. While it did not participate in determining whether Plaintiffs' agreement for payment with their attorneys would be hourly or contingency, Plaintiffs did not participate in Shell's decisions to breach the lease agreement. In our opinion, this has no bearing on the issue of attorney fees.
We have reviewed a number of cases on the issue of attorney fees, including Williamson, where the supreme court awarded a fee equivalent to $383.00 per hour. Considering the factors enunciated in Williamson, as well as Plaintiffs' fee agreements with their attorneys, we find $4 million to be a reasonable attorney fee.

Interest
Plaintiffs assign as error the trial court's denial of pre-judgment interest on the jury's awards for damages. As previously discussed, the award for Shell's improper disposal of saltwater was calculated to present day value by Plaintiffs economic expert. We find no error with the trial court's award of interest from the date of judgment only.
Shell trespassed on Plaintiffs' property when it remained after the lease expired. Trespass is a tort. Pursuant to La.R.S. 13:4203, legal interest commenced from the date of judicial demand.
In Alexander v. Burroughs Corp., 359 So.2d 607 (La.1978), the supreme court held that interest on a contractual obligation commenced from the date of default rather than from the date of judgment or judicial demand. As in Alexander, we find that Shell was placed in default by virtue of their receipt of Plaintiffs May 9, 1991 letter and failure to return the property in the condition it was in when the lease was signed. Accordingly, Plaintiffs are entitled to interest on their restoration claim from May 10, 1991.
Attorney fees are not ascertainable until awarded by the court, and interest thereon runs from the date of the award. Id. The same is true for expert witness fees and costs. See Thomas B. Catchings and Assoc. v. City of Baton Rouge, 621 So.2d 768 (La.1993). Accordingly, *53 legal interest is awarded on the attorney fees, expert witness fees, and other court costs from the date of the judgment awarding same.

Decree
For these reasons, the jury's awards of $33 million to restore the leased premises and $16,679,100.00 for Shell's illegal disposal of saltwater on the leased premises are affirmed; the trial court's award of attorney fees is amended to $4 million; the trial court's grant of a remittitur with regard to the jury's award of $927,000.00 for failure to vacate the leased premises is reversed and the issue is remanded to the trial court for further proceedings in accordance with this opinion; the trial court's dismissal of Plaintiff's claim for exemplary damages is reversed and the issue is remanded to the trial court for further proceedings. All costs of this appeal are assessed to Shell.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.