850 So.2d 686 (2003)
William G. CORBELLO, et al.
v.
IOWA PRODUCTION, Shell Oil Company, Shell Western E & P, Inc., et al.
No. 2002-C-0826.
Supreme Court of Louisiana.
February 25, 2003.
Opinion Granting Partial Rehearing June 20, 2003.
*690 George Arceneaux, III, Thomas M. McNamara, Patrick W. Gray, Kyle Patrick Polozola, Liskow & Lewis, Lafayette, Marie R. Yeates, Thomas A. Harrell, Baton Rouge, Winson & Elkins, Counsel for Applicant.
Patrick D. Gallagher, Jr., Richard E. Gerard, Jr., Scott J. Scofield, John M. Veron, Scofield, Gerard, Veron, Singletary & Pohorelsky, Lake Charles, Matthew J. Randazzo, Gordon, Arata, McCollam, Duplantis & Eagan, New Orleans, Counsel for Respondent.
Harry A. Johnson, III, Robert E. Meadows, Tracey M. Robertson, Counsel for Chevron U.S.A., Inc. (Amicus Curiae).
Scott James Scofield, Lake Charles, Counsel for H.C. Drew Estate (Amicus Curiae).
Linda S. Akchin, G. William Jarman, Baton Rouge, Richard S. Pabst, New Orleans, Counsel for Louisiana Mid-Continental Oil & Gas and American Petroleum Institute (Amicus Curiae).
Randall C. Songy, Brent G. Sonnier, Lafayette, Counsel for Louisiana Independent Oil & Gas (Amicus Curiae).
David N. Schell, Jr., New Orleans, Counsel for Union Oil Co. of California (Amicus Curiae).
Larry D. Dyess, Belle Chasse, Thomas J. Gayle, Drew A. Ranier, Brett M. Powers, Norval F. Elliot, III, Lake Charles, Counsel for Andrew L. Richard and Betty Richard (Amicus Curiae).
William A. Porteous, III, Michael G. Stag, Stuart H. Smith, New Orleans, Counsel for Joseph Grefer (Amicus Curiae).
Peter N. Freiberg, Stuart H. Smith, Michael G. Stag, Gladstone N. Jones, III, New Orleans, Counsel for Hazelwood Farm Inc. (Amicus Curiae).
Andrew A. Lemmon, Michael G. Stag, Stuart H. Smith, New Orleans, Counsel for Rathborne Properties LLC (Amicus Curiae).
William W. Goodell, Jr., New Orleans, Counsel for Roy O. Martin Lumber Co. (Amicus Curiae).
James P. Doherty, Jr., Opelousas, Robert P. Fuhrer, Morgan City, Gregory C. Lier, New Orleans, Counsel for Rathborne Properties, Hazelwood Farm Inc., C.M. Thibodaux, Ltd. (Amicus Curiae).
Scott R. Bickford, New Orleans, David L. Landry, Thiodaux, J. Clay McCaslin, Counsel for Plaquemine Parish Government and St. Mary Par. School Board (Amicus Curiae).
Newman Trowbridge, Jr., Counsel for Louisiana Landowners Association Inc. (Amicus Curiae).
Gerald C. deLaunay, LaFayette, Counsel for Aristide Broussard Heirs Partnership (Amicus Curiae).
JOHNSON, Justice.
This matter arises from a suit filed by landowners against Shell Oil Company to recover damages in trespass after expiration of a surface lease which was granted to Shell, for unauthorized disposal of saltwater on the property, and for the poor *691 condition of the leased premises. After a trial on the merits, the jury awarded damages to the landowners. The court of appeal affirmed in part, reversed in part, and remanded for further proceedings. We granted Shell's writ application to determine the correctness of the lower courts' decisions. Corbello, et al. v. Iowa Productions, et al., XXXX-XXXX (La.6/14/02), 818 So.2d 779. After review of the record, we reverse in part, remand in part, and otherwise affirm the court of appeal's decision.

FACTS AND PROCEDURAL HISTORY
In 1929, Ferdinand and Eva Heyd granted an oil and gas mineral lease in favor of Shell Oil Company, which then assigned the lease to Shell Western E & P (collectively, "Shell"). The lease covered 320 acres of land in Calcasieu Parish. Shell operated the mineral lease until 1985, when it transferred its interest in the lease to Rosewood Resources, Inc. (Rosewood).
In 1961, Shell obtained a separate lease from plaintiffs, Mr. Heyd's four surviving children, on 120 acres within the 320 acres covered by the oil and gas lease, known as the Iowa Field. Thereafter, Shell built an oil terminal on a five acre parcel within the leased acreage which it operated until 1993.
The 1961 surface lease expired May 10, 1991. On May 9, 1991, plaintiffs sent Shell a letter regarding the lease's termination date. The letter notified Shell that it had breached the lease agreement by disposing of saltwater on the property and by failing to maintain the property as provided in the lease. For approximately sixteen or seventeen months, plaintiffs and Shell attempted to resolve these issues.
In May 1992, plaintiffs filed suit, naming Iowa Production Company, Inc. and Polaris Enterprises, Inc. as defendants, to recover damages for trespass on the leased premises after expiration of the lease, for the unauthorized disposal of saltwater on the leased premises, and for the poor condition of the leased premises.[1] They also sought exemplary damages pursuant to La.Civ.Code art. 2315.3. Shell was named as a defendant in October 1992. It filed a third party demand against Rosewood. Plaintiffs named Rosewood as a defendant on its main demand, but settled with it on September 1, 1999. As part of the settlement, plaintiffs agreed to defend and indemnify Rosewood with regard to Shell's claims against it. Shortly before trial, Shell's third party claim against Rosewood was dismissed on a motion to recuse its counsel on the basis of a conflict of interest. However, the court of appeal reversed the trial court's dismissal of Rosewood. Corbello v. Iowa Prod. Co., 00-1403 (La.App. 3 Cir. 6/6/01), 787 So.2d 596, writ denied, 01-2334 (La.11/16/01), 802 So.2d 615.
In May 2000, the case was tried before a jury over a two and one-half week period. The jury awarded plaintiffs damages in the amounts of $927,000.00 for Shell's failure to vacate the leased premises after the surface lease expired; $33 million to restore the leased premises to its 1961 condition; and $16,679,100.00 for Shell's illegal disposal of saltwater on the leased premises. Pursuant to post-trial motions, plaintiffs were awarded $689,510.00 in attorney fees and expert fees were set at $65,000.00; the trial court reduced the jury's award of $927,000.00 for failure to vacate the leased premises to $32,500.00.
*692 The Third Circuit Court of Appeal affirmed the jury's awards of $33 million to restore the leased premises and $16,679,100.00 for Shell's illegal disposal of saltwater on the leased premises; increased the trial court's award of attorney fees from $689,510.00 to $4 million; reversed the trial court's remittitur with regard to the jury's award of $927,000 for failure to vacate the leased premises and remanded for further proceedings on the issue; and reversed the trial court's dismissal of plaintiffs claim for exemplary damages and remanded for further proceedings on the issue. Corbello v. Iowa Production, 01-567 (La.App. 3 Cir. 12/26/01), 806 So.2d 32.
Shell filed a writ of certiorari in this Court assigning numerous assignments of error.

LAW AND ANALYSIS
Restoration of the Leased Premises
We begin our discussion with Shell's assignments of error regarding the damage award for failure to reasonably restore the leased premises. Shell argues that the court of appeal erred in affirming the $33 million breach of contract award for failure to reasonably restore plaintiffs' property for a number of reasons. First, Shell argues that the court of appeal erroneously held that damages for a breach of a contractual obligation of restoration in a lease can be disproportionately greater (in this case, 300 times greater) than the market value of the property. Our first inquiry, then, is whether plaintiffs are entitled to the amount of damages needed to restore the property, without regard to market value, or whether the damage award should be tethered to the market value of the property.
Shell argues that the legal principles that restrain immovable property damages in tort and specific performance cases to the market value of the property should also apply in cases of damages for breach of contract. Shell contends that the amount of damages for breach of the contractual obligation of restoration of the property must be rationally or reasonably related to the market value of the property. Otherwise, awarding an amount which is disproportionately greater than the market value, according to Shell, would give plaintiffs a windfall because plaintiffs would be in a better position than they would be in if Shell had performed under the contract. That is, if Shell had complied with its obligation under the contract to restore the property to its original state upon termination of the lease, plaintiffs would be in possession of property worth $108,000.00. Thus, Shell argues, plaintiffs' damage award for Shell's breach of its contractual obligation should be reasonably or rationally related to the amount of $108,000.00.
In furtherance of its position, Shell argues that the amount of damages recoverable under a breach of contract claim must be controlled by the parties' mutually agreed upon expectations. La. C.C. art. 2045. Here, Shell maintains that the parties bargained for a restoration obligation limited by "reasonableness." Shell argues that to award plaintiffs damages in the amount of $33 million (300 times greater than the value of the property) is unreasonable. Shell contends that no rational, objective lessor would expect that the lessee would be required to restore the property at a cost disproportionately greater than the value of the property itself. Likewise, no rational, objective lessee would expect that such a reasonable restoration obligation would require the lessee to expend sums to restore the property that would be grossly disproportionate to what it would cost to purchase the property outright. For this reason, Shell argues, *693 the contractual obligation of reasonable restoration is confined by an "economic balancing process which balances the cost of perfect restoration against the value of the use to which the land is being put." La. R.S. 31:22 (comments).
Plaintiffs counter that this case is governed by the principle that "the contract is the law between the parties." Plaintiffs maintain that the parties bargained for, among other things, reasonable restoration of the property to its original condition, in exchange for Shell's use of the land for production of oil and gas for profit. Plaintiffs point out that the agreement did not in any way limit Shell's cleanup obligation to the value of the land. Plaintiffs maintain that the measure of damages for Shell's breach is not the damage to the "value" of the land, but the cost to the innocent landowner of doing what Shell promised but failed to do, restore the land to its original condition. Therefore, plaintiffs argue that the damage award should not be reasonably or rational related to market value of the property. Instead, the damage award should be that which was bargained for, the amount necessary to restore the property.
Plaintiffs further maintain that the parties must either agree upon what is "reasonable" or have a jury decide for them. In this case, the parties could not agree as to what was a reasonable cost of restoration, both parties rejecting each other's cleanup proposals. Thus, plaintiffs maintain that the question of the amount of damages necessary to reasonably restore the property was a factual issue decided by the jury. Plaintiffs argue that the jury, after weighing all evidence and testimony, both fact and expert, decided to believe the testimony of plaintiffs' expert as to what amount was needed to "reasonably restore" the property as nearly as possible to its original condition. Plaintiffs maintain that the court of appeal, finding no manifest error, correctly affirmed the jury's award.
After careful review of the applicable law and facts of this case, we disagree with the arguments presented by Shell and find that the damage award for a breach of contractual obligation to reasonably restore property need not be tethered to the market value of the property.
We agree with plaintiffs that the agreement in this case, like other contracts, is the law as between the parties. Since a contract establishes the law between the parties, the purpose of contract interpretation is to determine the common intent of the parties. La. C.C. art.2045; Shoreline Gas, Inc. v. Grace Resources, Inc., 34,517 (La.App. 2 Cir. 4/4/01), 786 So.2d 137, 140. The meaning and intent of the parties to a written instrument should be determined within the four corners of the document and its terms should not be explained or contradicted by extrinsic evidence. Id. (citing Brown v. Drillers, Inc., 93-1019 (La.1/14/94), 630 So.2d 741; Billingsley v. Bach Energy Corp., 588 So.2d 786, 790 (La.App. 2d Cir.1991)). When a contract is subject to interpretation from the four corners of the instrument, without the necessity of extrinsic evidence, that interpretation is a matter of law. Brown v. Drillers, Inc., supra. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation need be made into the parties' intent. La. C.C. art.2046; Magnon v. Collins, 98-2822 (La.7/7/99), 739 So.2d 191, 197; Billingsley, supra. Further, parties are free to contract for any object that is lawful, possible, and determined or determinable. La. C.C. art 1971.
Section 8 of the surface lease entered into by Shell and plaintiffs reads: *694 Lessee agrees to indemnify and hold lessor harmless from any and all loss, damage, injury and liability of every kind and nature that may be caused by its operations or result from the exercise of the rights or privileges herein granted. Lessee further agrees that upon termination of this lease it will reasonably restore the premises as nearly as possible to their present condition. (Emphasis added)
We first note that the language of the contract itself does not limit Shell's liability for reasonable restoration to the market value of the property. If Shell wanted such a limitation, it could have bargained for such; it did not do so. Instead, Shell signed an agreement obligating itself to "reasonably restore the premises as nearly as possible to their present condition." Shell argues that it is not clear under the contract as to what constitutes "reasonable" restoration and urges this court to find that it would be unreasonable to require it to pay restoration costs which greatly exceed the market value of the property. We disagree.
We find unreasonable Shell's theory that it could conduct its oil and gas operations on plaintiffs' property without limit to the amount of damage that may be caused to the property through Shell's neglect and/or faulty operations, and then have its liability to restore the property limited to or rationally related to the value of the land. Likewise, we find it unreasonable for plaintiffs to have contemplated the use of its land with Shell's responsibility of restoration being only to clean the property at a cost tethered to the market value of the property even though that cost may be greatly disproportionate to the actual amount needed to restore the property as near as possible to its condition before Shell began its operations.
Shell correctly notes that our courts have consistently restrained property damage awards in tort cases. See Mossy Motors, Inc. v. Sewerage and Water Board of the City of New Orleans, 98-0495 (La.App. 4 Cir. 5/12/99), 753 So.2d 269; Dual Drilling Company v. Mills Equipment Investments, Inc., 97-1010 (La.App. 4 Cir. 1/07/98), 705 So.2d 1246; Cutrer v. Illinois Central Gulf R.Co., 581 So.2d 1013 (La.App. 1 Cir.1991). Generally, three approaches have been followed by the Louisiana courts in arriving at the amount of damages to property: (1) the cost of restoration if the thing damaged can be adequately repaired; (2) the difference in value prior to and following the damage; or (3) the cost of replacement new, less reasonable depreciation, if the value before and after the damage cannot be reasonably determined, or if the cost of the repairs exceeds the value of the thing damaged. Cutrer v. Illionois Central Gulf R. Co., supra at 1020, 1021 (citing Mouton v. State of Louisiana, 525 So.2d 1136, 1143 (La. App. 1st Cir.), writ denied, 526 So.2d 1112 (La.1988)). We held in Roman Catholic Church v. La. Gas Serv. Co., 618 So.2d 874 (La.1993), which involved tortious damage to immovable property, that "... if the cost of restoring the property in its original condition is disproportionate to the value of the property or economically wasteful, unless there is a reason personal to the owner for restoring the original condition or there is a reason to believe that the plaintiff will, in fact, make the repairs, damages are measured only by the difference between the value of the property before and after the harm." Id. at 879-80.
We find that damages to immovable property under a breach of contract claim should not be governed by the rule enunciated in Church. We find that the contractual terms of a contract, which convey the intentions of the parties, overrule any policy considerations behind such a rule limiting *695 damages in tort cases. We recognize that in some cases, as in the instant case, the expense of restoration of immovable property can be extremely high. However, while we find it logical in tort cases to tether the amount of damages by balancing the amount to be paid by the negligent tortfeasor against the goal to restore the plaintiff, as closely as possible, to the position which he would have occupied had the accident never occurred, this same logic should not be extended to breach of contract cases.
The measure of damages in breach of contract cases is governed by the four corners of the contract. In this case, Shell, a sophisticated company with vast experience in negotiating oil and gas contracts, bound itself by contract to "reasonably restore plaintiffs' property as near as possible to its current condition." Shell must not be allowed to now alter the terms of this contract by limiting its liability to an amount reasonably or rationally related to the market value of the property.
Thus, we decline to set forth a rule of law, suggested by Shell, that in cases of breach of a contractual obligation of restoration in a lease, the damage award to plaintiffs must be tethered to the market value of the property. To do so would give license to oil companies to perform its operations in any manner, with indifference as to the aftermath of its operations because of the assurance that it would not be responsible for the full cost of restoration. The landowner would receive a damage award tethered to the market value of the property and would be left with partially clean land and potential liability to others who are affected by this unclean land. In the end, it is the oil companies, not plaintiffs, who would get a windfall. Accordingly, we find Shell's argument that plaintiffs' damage award in this case should be rationally related to the market value of the property to be without merit.
Shell also argues that the court of appeal erroneously relied on the two exceptions set forth in Church, supra, in determining damages recoverable for the breach of contractual obligation to restore because the Church case articulates a rule for measuring property damages in tort, and did not deal with a lessee's contractual obligation of reasonable restoration. Shell further argues that even if Church is applicable to this breach of contract claim, the court of appeal erroneously concluded that the facts of the instant case fall within the two exceptions and the damages should, therefore, be rationally related to the market value of the property.
In response, plaintiffs argue, first, that Shell's contention is frivolous because Shell was the party who requested the trial court's jury instruction that liability should be limited to the value of the property in accordance with Church. Shell now seeks to distinguish Church only after the court of appeal held that the two exceptions in Church are applicable in this case. In any event, plaintiffs argue that the result is the same whether Church applies or not because the amount awarded by the jury is both the amount necessary to place plaintiffs in the position they would be in if Shell performed under the contract and the amount needed to restore the property under the Church case. Plaintiffs maintain that there was ample evidence to support the court of appeal's finding that the Church exceptions applied.
We too find it peculiar that Shell, on the one hand, argues vociferously to this Court that the governing legal principles restraining the measure of damages to immovable property in tort cases, should also apply to breach of contract cases, yet, maintain that the court of appeal erroneously relied on Church and its exceptions *696 because that case involved tort principles and not breach of contract. In any event, because we find that damage awards for damage to immovable property in breach of contract claims do not have to be tethered to market value of that property, we need not address Shell's arguments that the two exceptions in Church do not apply.
The remaining question, then, is whether the jury's award for restoration was reasonable. In determining damages, the trier of fact is accorded much discretion. The assessment of damages by jury is a determination of fact. The role of an appellate court in reviewing an award of general damages is not to decide what it considers to be an appropriate award, but rather, to review the exercise of discretion by the trier of fact. The adequacy of the award should be determined by facts or circumstances particular to the case under consideration. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Upon review, we conclude that the court of appeal did not err in affirming the $33 million award in restoration damages.
The court of appeal based its decision largely upon the expert testimony presented at trial from both sides regarding the amount of money needed to restore plaintiffs' property as nearly as possible to its original condition. Plaintiffs' expert on restoration, Austin Arabie, testified that cleanup of the premises would require removal of the sources of contamination at a cost of $5 million, installation of a groundwater recovery system at a cost of $3 million, and operation of the recovery system and disposal of the contaminated groundwater at a cost of $1.3 million per year for a minimum of five years. His minimum estimate for restoration was $15 million. He testified that an additional $24 million would be necessary for a twenty year cleanup. Mr. Arabie's investigation of the site was extensive. He visited the site on at least thirteen occasions and collected numerous samples.
The jury also heard testimony from Shell's experts that much less was required to restore the premises to their 1961 condition. However, the testimony revealed that Mr. Arabie's investigation was far more extensive than any of Shell's experts and Mr. Arabie performed tests that Shell's experts did not, including electromagnetic testing, which revealed the types and amounts of materials buried on the premises. This test specifically revealed that there was material buried down to twelve feet on the premises, including a very old gasoline dispensing tank at five feet; an old barrel labeled triethylene glycol that had been crushed and dumped; old tires and sludge out of a buried drum at two and one-half to three feet; aboveground tanks; a 500 gallon tank with piping on the side; an old well sign; as well as the contaminants his testing identified. Mr. Arabie also testified that the surface of the premises would not support vegetation, including one of the areas that Shell claimed it had remediated.
We note, as did the court of appeal, that throughout the course of the trial, plaintiffs put Shell's credibility at issue. The court of appeal specifically noted the fact that Shell had retained experts years before this lawsuit was filed, who had done testing and made recommendations in this matter and were available for trial. However, Shell retained different experts within months of the trial and presented their testimony only. The court of appeal correctly concluded that "the jury may have concluded that Shell had something to hide or that the previously-retained experts' testimony would be detrimental to its position." Corbello, 806 So.2d at 44.
*697 As stated by the court of appeal, "the jury saw and heard Plaintiffs' experts and Shell's experts' [sic] identify those things on the property that they considered to be problems, how they should be addressed, and the cost to address them. They saw photographs of the different items found buried under the surface of the property." Corbello, 806 at 49. Based on the evidence presented to the jury, along with Shell's contractual obligation to restore the premises as nearly as possible to its 1961 condition, we find, as did the court of appeal, no basis for concluding the jury committed manifest error in accepting Mr. Arabie's testimony and recommendations, including the award of $33 million in damages, which award was actually less than Mr. Arabie's recommended award.
Shell further argues that the court of appeal erred in allowing $28 million of the $33 million to be recovered for a wholly speculative injury to the Chicot Aquifer, which is the source of the town's drinking water supply.[2] Shell argues that plaintiffs failed to offer any reliable, scientific evidence demonstrating any real threat to the Chicot Aquifer. Shell maintains that although plaintiff's expert, Arabie, surmised that contaminants in the groundwater might possibly migrate to the Chicot Aquifer, since Arabie had not tested the aquifer, he did not and could not testify that the contamination had in fact migrated to the aquifer or even that such migration was more probable than not. Shell maintains that plaintiffs do not need to clean the groundwater for their intended use of the property, but will only allegedly clean the groundwater because of this alleged threat to the Chicot Aquifer. In essence, Shell believes that it is only responsible for paying damages for restoration of the surface and not for any speculative contamination of the groundwater. Shell argues that if there were a real injury to the Chicot Aquifer, then Shell not private landownerswould be the party required to respond for that public injury.
Plaintiffs counter that the record contains sufficient evidence of groundwater contamination posing a real threat to the Chicot Aquifer. Specifically, plaintiffs argue that not only did Mr. Arabie testify that the contamination of the property poses a threat to the Chicot Aquifer, Shell's environmental expert, Dr. Lloyd Deuel, admitted in his deposition that the extensive groundwater contamination might reach the Chicot Aquifer and other drinking water supplies in the area. Dr. Deuel also testified that he did not think Shell should notify anyone unless someone complained. This alone, plaintiffs argue, proved the risk to the Chicot Aquifer.
After reviewing the record, we find the evidence does not support Shell's "speculative injury" argument. The court of appeal reviewed the expert testimony of both sides on the issue of the threat to the Chicot Aquifer and concluded that the jury was not manifestly erroneous in accepting the testimony of plaintiffs' expert, Mr. Arabie. As did the court of appeal, we find Mr. Arabie's testimony persuasive. As we previously stated, Mr. Arabie's investigation was extensive. In his opinion, the contamination of the property poses a threat to the Chicot Aquifer. He explained that because of the depth of the contamination and the nature of the clays between the contamination and the aquifer, contamination may travel into the *698 aquifer. Mr. Arabie also testified that Shell's expert, Mr. Deuel, agreed in deposition that it was possible the drinking water source might be contaminated. Dr. Deuel, was one of the experts Shell employed prior to trial, but did not call as a witness at trial. The court of appeal noted that apparently, Dr. Deuel was in the courtroom throughout the trial; however, he was not called to testify regarding his findings or to dispute the statement attributed to him by Mr. Arabie. Considering this testimony, we cannot say that the court of appeal erred in affirming the $33 million award, including the $28 million for groundwater cleanup.
Next, Shell argues that the court of appeal erred in affirming the $33 million award for reasonable restoration to plaintiffs for what is strictly an alleged public injury, even though private plaintiffs have no legal duty to use the award to restore the property. $28 million of the $33 million award compensates plaintiffs for the cost of installing a groundwater recovery system, which Shell argues is not intended to restore the property for plaintiffs' use, agriculture. Shell argues that Louisiana landowners do not own the groundwater underneath their property. Adams v. Grigsby, 152 So.2d 619, 622-24 (La.App. 2 Cir.), writ ref'd, 244 La. 662, 153 So.2d 880 (1963). Shell maintains that the risk that the public will go unprotected if private plaintiffs are allowed to recover for strictly public injuries is amplified further by La. R.S. 30:89.1.[3] Under that statute, a defendant that pays a private restoration damages award receives a credit against the costs of any cleanup later required by the Office of Conservation. Shell argues that if the private plaintiff, having no legal obligation to use the award to clean up, fails to use the monies to remediate the public injury, then application of the statutory credit would result in a public injury left unremedied. Magnolia Coal Terminal v. Phillips Oil, 576 So.2d 475, 486 (Calogero, C.J. and Lemmon, J., concurring). The state could not thereafter require the defendant to remedy the public injury. On the other hand, Shell argues, if for some reason the statute were held inapplicable to a private plaintiff's recovery for a strictly public injury, then the defendant who paid a private award for failure to reasonably restore would face the possibility of double payment, i.e., paying again for the same damages when the state orders defendant to remediate the public injury.
Plaintiffs counter that Shell's public injury theory is unfounded as it is based solely on a concurring opinion in Magnolia Coal, supra. Plaintiffs argue that the concurring opinion offered only the observation that the landowner was not bound to use a clean up award to restore his land, and did not say the landowner should not recover because of a "public injury." Plaintiffs argue that the majority's ruling *699 in Magnolia Coal directly refutes Shell's theory that a landowner cannot sue for a supposed "public injury." Plaintiffs maintain that landowners have no special motivation to clean up contamination on their property and if anything, landowners are more interested in the condition of their property than a distant state agency. Thus, according to plaintiffs, by empowering both landowners and the Office of Conservation with the right to sue polluters, the legislature has better insured protection of the environment.
Plaintiffs further maintain that it is not unusual that a plaintiff who recovers money is not required to use that money a certain way. Plaintiffs use as examples: (1) a business who recovers for damage to a building is not required to repair the building and (2) an injured plaintiff who recovers a lump sum for lost future income is not required to purchase an annuity to replace his loss. In neither case, the wrongdoer is no less liable for the damage.
We find that the fact that the contamination of the groundwater, for which the plaintiffs recovered $28 million in restoration damages, is a public injury as well as private injury, does not prevent plaintiffs from collecting damages for cleanup of the groundwater. The legislature has not made such a declaration and we do not find this Court has authority to do so.
In recent years, the legislature has addressed the issue of oilfield contamination on several occasions. In 1993, the legislature enacted the Louisiana Oilfield Site Restoration Law, La. R.S. 30:80 et seq. The legislature found and declared that "a present and future benefit to the environment, public health, safety, and welfare would be to clean up, close, and restore oilfield sites." La. R.S. 30:81(a)(1). The legislature further declared state laws and regulations must comprehensively address those situations where proper and timely cleanup, closures, and restoration of orphaned oilfield sites must be assured. La. R.S. 30:81(A)(2).
While recognizing the need for a comprehensive body of legislation wherein the state would oversee the problem of oilfield waste sites, we note that the legislature was careful not to take away a private landowner's right to seek redress against oil companies. The legislature did not expressly take away nor do we believe that it intended to take away this right from private landowners. Instead, we find that it preserved a private landowner's right to seek redress. La. R.S. 30:81(C) states: "[n]othing in this part shall be deemed to alter or impair any rights and responsibilities established by contract between private parties." When the legislature later addressed the possibility of double payment for cleanups by oil companiesonce to the landowner and again to the regulatorthe legislature again preserved the landowners' right to sue, but gave the oil companies a "credit" for amounts paid to the landowner in a subsequent enforcement action by the Office of Conservation. La. R.S. 30:89.1.
There is no indication as to whether the legislature contemplated the fact that private landowners may or may not use the money from the judgment to restore land, but it is clear that it did not implement a procedure to ensure that landowners will in fact use the money to clean the property. The question for this Court then becomes whether this Court has authority to modify a breach of contract damage award to a private landowner because the landowner has no duty to actually use the money to clean or restore the land where the legislature has not chosen to mandate remediation or restoration.
Of course, this issue is res nova in this Court. We also find no Louisiana appellate court decisions, other than the court of *700 appeal in the instant case, on this issue. Shell cites a recent Mississippi Supreme Court case in support of its position that plaintiffs should not be allowed to recover damages for the groundwater cleanup, Chevron U.S.A., Inc. v. Smith, 844 So.2d 1145 (Miss.2002). In Chevron, the court reversed a $2.3 million restoration damages award for cleanup of oilfield waste because the plaintiffs failed to exhaust administrative remedies before seeking relief in the trial court. The court specifically found that the plaintiffs were required under precedent to first seek restoration of their property from the Mississippi Oil and Gas Board before the trial court could consider the issue and possibly assess an appropriate amount of damages. Shell specifically relies on the following reasons, set forth by the Chevron court:
The [Oil and Gas] Board is more suited than the average juror to understand the broad scope of the regulations and the factual scenarios presented by each case of environmental pollution.
This Court cannot allow a private landowner to pursue restoration of his or her land in the courts of this State by sidestepping a very vital and useful agency that could help protect the average Mississippian from the dangers of ... pollution. Since no court can order the plaintiffs in this case to expend the award on decontaminating the property, the outcome allowed by the trial court does nothing to protect the citizens of Mississippi from the dangers of ... contamination... The citizens of this state are better served by having an expert regulatory agency enforce the environmental statutes rather than waiting for the private citizen to bring individual actions for damages and restoration, which are no guarantee that the pollution will be eradicated.
Plaintiffs distinguish Chevron from the instant case on several grounds. First, plaintiffs point out that unlike the landowners in Chevron, plaintiffs herein had a contract with Shell that allowed Shell to use their land in return for which Shell promised to restore the property to its original condition at the end of the contract. Second, plaintiffs maintain that they were forced to file suit because Shell ignored their repeated demands to honor the agreement to clean up the property. In contrast, the landowners in Chevron expressly refused to allow the companies that polluted their land to clean the property, effectively waiving their private tort claims by refusing to mitigate their damages. Third, plaintiffs contend that the property in the instant case has been owned by the Heyd family since 1915 and the family clearly intends to clean it up. In contrast, the landowners in Chevron purchased their property after it had been polluted and had no intention of cleaning it up. Fourth, unlike the oil company in Chevron, Shell has no standing to argue that an administrative agency had "primary jurisdiction over the Heyd's private contract claim." Fifth, plaintiffs argue that even if Shell had standing to make this argument, the Mississippi courts do not suggest that a private landowner does not have the right to enforce an ordinary land lease that requires the lessee to clean up the property at the end of the lease. Beyond that, Louisiana law unquestionably preserves the rights of private landowners to enforce any contract to clean up their property regardless of state regulation of oilfield activities. Accordingly, plaintiffs argue that Chevron should not govern any issue in this case.
We agree with plaintiffs that we are not bound by, nor or we persuaded by, the outcome of the Chevron case. We first note that the court in Chevron was not faced squarely with the issue involved in *701 the instant case, i.e. whether private landowners should be allowed to recover damages for groundwater cleanup, possibly affecting public health, where there is no legal duty to do so. The sole issue in Chevron was prematurity, i.e. whether landowners were required to seek administrative relief from the Oil and Gas Board before bringing an action against the oil company for pollution of their property. We also note that Chevron did not expressly hold that a private landowner is not allowed to recover restoration damages because of the lack of a legal duty to restore the property. Instead, the court merely expressed its sentiment that the citizens of Mississippi are better served by resorting to the regulatory agency rather than waiting for the private landowner to bring an action for damages where there is no guarantee that the pollution would be eradicated.
Private landowners in Louisiana have no duty to seek relief from an administrative agency before filing suit against an oil company. In fact, our decision in Magnolia Coal, supra, allows a trial court to award damages caused by failure to restore without requiring the plaintiff to first seek relief through the Department of Natural Resources, the agency charged with protecting the State's natural resources as public trustee. We expressly found in Magnolia Coal that "damages from soil pollution are within the conventional knowledge and expertise of a trier of fact and the court of appeal erred in deciding that the plaintiff's damages cannot be fixed until the commissioner of conservation holds a new hearing." Magnolia Coal, 576 So.2d at 484. Further, contrary to Shell's contention, the court's review in Magnolia Coal was not limited to a strictly private injury, but also involved groundwater damages, as in the instant case. There, we specifically found "[n]ot only the soil, but the groundwater, the Mississippi river and the public have been damaged." Magnolia Coal, 576 So.2d at 484.
In the instant case, we are faced with two opposing public policy concerns. We certainly recognize the policy concerns asserted by Shell regarding the possibility of unclean land, which would likely affect the public by way of contamination of the drinking water supply, in the event the plaintiffs do not use the money for remediation. However, we also recognize the policy concern asserted by plaintiffs in that if landowners cannot sue for cleanup costsespecially where, as here, they have a contract in handit would leave only understaffed and underfunded state agencies to oppose the oil companies. In this situation, there is still a strong possibility that the land will remain polluted. Shell continued its negligent operations on plaintiffs' property for over 70 years without asserting any cleanup efforts, even when such cleanup was recommended by its own experts. It is not likely that Shell will now clean the property unless and until forced to do so by a state agency.
Based on the above analysis, we conclude that plaintiffs are entitled to collect the entire $33 million restoration damage award, including the $28 million allocated for groundwater cleanup. Accordingly, the court of appeal's decision in this regard is affirmed.
Solidary Liability of Rosewood
On December 30, 1985, Shell executed an Assignment and Bill of Sale to Rosewood, with an effective date of July 1, 1985, transferring its rights, title, and interest in and to the 1929 mineral lease. Rosewood operated under the lease for approximately four (4) years until it executed an Assignment and Bill of Sale, effective July 1, 1989, transferring its rights, title, and interest in and to the 1929 mineral lease to William J. Krueger.
*702 Shell filed a third party demand herein against Rosewood seeking full indemnification and/or contribution. The trial court dismissed the third party suit by Shell against Rosewood on the basis of a conflict of interest.[4] Shell appealed the dismissal. The court of appeal, finding that there was insufficient evidence in the record to support a finding of conflict of interest, reversed the trial court's dismissal of Shell's third party demand against Rosewood.[5]Corbello, XXXX-XXXX, (La.App. 3 Cir. 6/6/01), 787 So.2d 596, writ denied, 01-2334 (La.11/16/01), 802 So.2d 615.
Although at the time of trial, the third party demand against Rosewood was dismissed, the evidence of the assignment of the mineral lease from Shell to Rosewood, as well as evidence of Rosewood's activities on the premises after the assignment, were presented at trial. The jury was also presented with a verdict form which listed Rosewood as a defendant, and allowed the jury to assign a percentage of fault to Rosewood. The jury returned a verdict which assigned 0% of fault to Rosewood and 100% fault to Shell. Upon review of the main demand, the court of appeal rejected Shell's argument that the jury erred in not assigning any responsibility to Rosewood. Corbello, 806 at 49.[6]
Shell argues that Rosewood is contractually liable in solido with Shell and the court of appeal, therefore, erred in failing to hold that plaintiffs' release of Rosewood extinguishes Shell's restoration obligation in toto or at least to the extent of one-half its virile share. Shell maintains that Rosewood's restoration obligation is indivisible with Shell's restoration obligation. Shell asserts that in the assignment of the 1929 mineral lease to Rosewood, Shell and Rosewood unambiguously agreed that, as between Shell and Rosewood, Rosewood would be responsible for the entire restoration obligation. Shell argues that plaintiffs' decision to settle with, and release, Rosewood also released Shell. Shell argues further that in the event this Court determines that the assignment *703 did not constitute an agreement as between Shell and Rosewood, the release of Rosewood would relieve Shell of one-half the restoration liability.[7]
Plaintiffs contend that Rosewood cannot be a solidary obligor to repair any damage to plaintiffs' property because it never had an obligation to repair in the first place. It had no obligation because, as the jury unanimously found, it didn't cause any damage. It had no obligation to repair the damage under contract law because Rosewood's only contract was the 1929 mineral lease. The duty to repair the leased premises does not arise until the lease expires, at which time the lessee must return the property in good order. The 1929 mineral lease is still in effect and is not the subject of this litigation. Thus, even the present leaseholder does not yet have a duty to repair under the terms of that lease.
We cannot say that the jury's finding of no fault on the part of Rosewood is "clearly wrong." An adjustment in an apportionment of fault will only be made if it is "clearly wrong," and only "to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion." Clement v. Frey, 95-1119 (La.1/16/96); 666 So.2d 607. As stated, the jury had before it evidence of the assignment of the 1929 mineral lease to Rosewood and all evidence of Rosewood's activities on the property. In finding no error in the jury's finding of no fault on the part of Rosewood, the court of appeal noted that the jury "heard and considered plaintiffs' expert testimony that the contamination on the property probably occurred before Rosewood's involvement and the testimony of Rosewood employees regarding their management of the property. The jury also considered the evidence of Shell's experts who opined that Rosewood's activities contributed to the condition of the property." Corbello, 806 at 49. Under these circumstances, the jury decided the credibility issues against Shell. We do not find that the court of appeal erred in affirming the jury's finding in this regard.
Further, under the facts of this case, we find that Shell has failed to prove that a solidary obligation existed between Shell and Rosewood for the damages suffered by plaintiffs as a result of Shell's activities on the leased premises. A solidary obligation shall not be presumed and arises only from a clear expression of the parties' intent. La. C.C. art. 1796. An obligation is solidary for the obligors when each obligor is liable for the whole performance. La. C.C. art. 1794. The record indicates that Rosewood was assigned only the 1929 mineral lease, not the 1961 surface lease. Shell has failed to show any connection between Rosewood and the negligent operations of Shell under the 1961 surface lease on plaintiffs' property. Accordingly, we find that the court of appeal did not err in finding that Rosewood was not solidarily liable with Shell for the property damages sustained by plaintiffs.
Unauthorized disposal of Saltwater
Was it authorized?
Shell argues that the lower courts erred in interpreting the 1961 lease to limit its authority to dispose of saltwater. Shell contends that there was no breach of contract for unauthorized disposal of saltwater because the lease authorized it, *704 through its general grant of authority, to install and operate saltwater disposal facilities on the leased property to dispose of saltwater produced by it and other producers in the Iowa Field.
As noted by the court of appeal, paragraph two of the lease begins with a general grant of authority, which is followed by a provision that specifically governs the disposal of saltwater. Paragraph two states, in pertinent part:
The purpose of this lease is to grant to LESSEE the exclusive use (except as hereinafter provide) of the above described land to erect, maintain, use, operate, and replace thereon such buildings, structures, tanks, separators, meters, pumps, pipes and pipe lines, telephone and electrical transmission lines, and other facilities, installations or equipment as may be necessary or useful in the general conduct of LESSEE'S business in the Iowa Field and/or other fields, including, without limitation, the producing, handling, storing, treating, processing and transporting of liquid and/or gaseous hydrocarbons and the products thereof, or other substances, without restriction as to source, ownership or destination thereof. Without limitation of the foregoing, LESSEE shall have the right to use the above described premises for the disposal of saltwater produced by it from its mineral leases or leases operated by it in the Iowa Field, or extensions thereof, whether such salt water be produced during operations on land owned by Lessor or land owned by others. (Emphasis added)
Shell contends that the provision (immediately following the broad grant of authority) specifically setting forth the saltwater disposal rights is merely an example of the authority granted under the general scope of the contract but did not limit the broad grant of authority. Shell argues that this specific example was included to eliminate any doubt that disposal of saltwater produced on Shell leases in the Iowa Field was included within the broad grant, but did not limit its disposal rights.
Plaintiffs argue that if the first sentence granted Shell unlimited saltwater disposal rights, there would have been no point in the second sentence, especially in light of the fact that the second sentence is the only sentence that mentions saltwater disposal. Plaintiffs further contend that since Shell drafted the contract, any ambiguity must be construed against it and in favor of plaintiffs.
We find that the court of appeal correctly followed the well settled law that "in the interpretation of statutes and contracts, the specific controls the general." Corbello v. Iowa Production, 2001-567 (La.App. 3 Cir. 12/26/01), 806 So.2d 32, (citing Mixon v. St. Paul Fire & Marine Ins. Co. of St. Paul, Minn., 147 La. 302, 306, 84 So. 790, 791 (1920)). The above quoted provision unambiguously sets forth what saltwater Shell can dispose of on the leased premises: saltwater produced by it on the Heyd property or any other property in the Iowa Field. Disposal of saltwater produced in the Iowa Field by anyone other than Shell was not authorized and disposal of saltwater produced by Shell anywhere other than the Heyd property or in the Iowa Field was not authorized. Accordingly, we find that the court of appeal did not err in finding that Shell's disposal of saltwater from Shell's Gas Plant outside the Iowa Field, the Hawthorne lease, the Kings Bayou lease, and the Mobile Gas Plant was a breach of the 1961 contractual lease.
We find it important to note that this damage award is derived from a separate and distinct cause of action from the restoration *705 damage award. Shell breached the specific provision under the lease to reasonably restore plaintiffs' property, as well as the specific provision governing saltwater disposal. The damage award for unauthorized saltwater disposal, unlike the restoration damage award, is not awarded for the purpose of cleaning the property. Instead, it is an award based simply on Shell's obligation for its contractual breach of the saltwater disposal provision.
Prescription
Shell next argues that any breach of contract claim against it for unauthorized disposal of saltwater has prescribed and the court of appeal erroneously held that the "continuing tort" theory applied to extend the 10 year prescriptive period for a breach of contract claim.
The prescriptive period for a breach of contract claim is 10 years from the date that the cause of action arose. La. CC. Art. 3499; Abdul-Alim Amin v. Universal Life Ins. Co. of Memphis, Tenn., C.A.1983, 706 F.2d 638 citing Scobee v. Lewis, 264 So.2d 704, 708 (La.App.), writ denied, 262 La. 1179, 266 So.2d 451 (1972). We find that plaintiffs' breach of contract claims against Shell, including the claim for unauthorized disposal of saltwater, arose upon termination of the 1961 surface lease, at which time Shell was to tender the property back into plaintiffs' possession. Prior to termination of the lease, plaintiffs were obligated to maintain Shell in peaceful possession of the property, free from interference or trespass by plaintiffs during the term of the lease. See La. C.C. art. 2692; Bordelon Leasing, Inc., v. Thibodeaux Air Conditioning Sales, Inc., 386 So.2d 120 (La.App. 3 Cir.1980) (citing Mid-Continent Refrigerator Company v. Williams, 285 So.2d 247 (La.App. 3rd Cir.1973)). Plaintiffs, therefore, had 10 years from the date of termination of the contract to file suit against Shell for breach of the contractual provisions of the lease. Plaintiffs' 1992 suit against Shell was, thus, clearly within the 10 year prescriptive period. Accordingly, we find Shell's claim of prescription as to plaintiffs' claim for unauthorized saltwater disposal under the terms of the contract to be without merit.
Calculation of Damages
Shell next argues that the $16.7 million damage award to plaintiffs for unauthorized disposal of saltwater should be reversed because the lower courts erroneously calculated the damage award using an investment/inflation factor presented by plaintiffs' expert, in lieu of prejudgment interest, to bring the past actual damages to present value as of the trial.
We find merit in Shell's argument. Regarding the issue of damages, the trial court allowed plaintiffs to introduce evidence of the cost savings Shell realized from disposing of saltwater on the plaintiffs' property in lieu of commercial disposal. Plaintiff's expert petroleum engineer, William Griffin, testified that the volume of illegally disposed saltwater was 1,629,723 barrels. He also testified that it would have cost Shell $1.00 per barrel to dispose of that saltwater. Thus, the base amount of damages for Shell's unauthorized saltwater disposal was $1,629,723.00 million ($1 per barrel for 1,629,723 barrels). The record indicates that the unauthorized injection of saltwater was insignificant in comparison to the legal injection of saltwater from the Iowa Field. The amount of saltwater legally injected into the ground during the contract period was some 500 million barrels. On the other hand, the illegal injection of saltwater from other sources totaled only 1.6 barrels, approximately.03 percent of the amount injected legally. Thus, the damage to plaintiffs as a result of Shell's unauthorized disposal of saltwater appears de minus.
*706 The additional amount of over $15 million, included in the jury's 16.7 million saltwater damage award, was derived at based on the testimony of plaintiffs' expert economist, Dan Cliffe. Cliffe testified that either an inflation and/or investment factor should be applied to increase the past actual damages to bring those damages to present value at the time of trial.
Mr. Cliffe, first calculated the present day value of $1,679,100.00 using a method representing investment of this amount in the Standard & Poor 500 (S & P) for a present value (time of trial) of $28,031,108.00. The second method used was a calculation which factored in inflation only for a present value of $6,908,324.00. This method did not compute any return on investment.
Shell argues that the proper method in calculating the present value of the damages in this case is through the use of prejudgment interest. Prejudgment interest, which stems from the damages suffered by the victorious party, is meant to fully compensate the injured party for the use of funds to which he is entitled but does not enjoy because the defendant has maintained control over the funds during the pendency of the action. Sharbono v. Steve Lang & Son Loggers, 97-0110 (La.7/1/97), 696 So.2d 1382; L & A Contracting Co., Inc. v. Ram Indus. Coatings, Inc., 99-0354 (La.App. 1 Cir. 6/23/00), 762 So.2d 1223. Shell argues that the court of appeal's decision affirming the use of an investment/inflation factor allows plaintiffs to circumvent the limitations of prejudgment interest by adding an additional amount to past actual damages which greatly exceeds the "lawful" rate of prejudgment interest. Shell cites Saden v. Kirby, 98-1762 (La.App. 4 Cir. 4/5/00), 759 So.2d 921, 932, writ denied, 00-1270, 1287 (La.6/30/00), 765 So.2d 1070, for the proposition that present value concepts may not be used in lieu of prejudgment interest.
We agree with Shell that the court of appeal erred in allowing a past damage award based on an investment/inflation factor instead of using the rate of prejudgment interest to determine the present value of the damages. Prejudgment interest, which stems from the damages suffered by the victorious party, is meant to fully compensate the injured party for the use of funds to which he is entitled but does not enjoy because the defendant has maintained control over the funds during the pendency of the action. Sharbono v. Steve Lang & Son Loggers, 97-0110 (La.7/1/97), 696 So.2d 1382; L & A Contracting Co., Inc. v. Ram Indus. Coatings, Inc., 99-0354 (La.App. 1 Cir. 6/23/00), 762 So.2d 1223. Unlike judgments in ex delicto actions wherein legal interest attaches from judicial demand, interest is recoverable on debts arising ex contractu from the time they become due, unless otherwise stipulated. La. R.S. 13:4203; LSA-C.C. art.1938; Schiro-Del Bianco Enterprises, Inc. v. NSL, Inc., 99-1237 (La.App. 4 Cir. 5/24/00), 765 So.2d 1087; Calhoun v. Louisiana Materials Co., 206 So.2d 147 (La. App. 4th Cir.1968), writ refused, 251 La. 1050, 208 So.2d 324 (1968); Teledyne Movible Offshore v. C & K Offshore, 376 So.2d 357 (La.App. 3rd Cir.1979).
In Kirby, supra, cited by Shell, the plaintiffs argued that the Consumer Price Index (CPI) was warranted to bring a past loss of real and personal property up to present value. The court of appeal found that the trial court was correct in not applying the CPI stating, "to enhance an award through the use of the CPI would be to award personal property losses occurring in 1983 at the 1998 value, which the trial court could not lawfully do." Kirby, *707 at 932.[8]
Our courts have consistently used prejudgment interest to assess damages for past loss and we find no jurisprudence to support the lower courts' decision in this case to use an investment/inflation factor in lieu of prejudgment interest. Accordingly, we now hold that the proper measure to assess damages for past loss, is the use of the lawful rate of prejudgment interest.
Accordingly, the court of appeal's decision affirming the trial court's award of $16.7 million is reversed and remanded to the court of appeal to determine the proper award of damages for unauthorized disposal of saltwater using the lawful rate of prejudgment interest.
Exemplary Damages
Shell argues that the court of appeal erred in reinstating plaintiffs' claim for exemplary damages under former article 2315.3 of the Louisiana Civil Code.[9] Former article 2315.3 provided, in pertinent part:

In addition to general and special damages, exemplary damages may be awarded, if it is proved that plaintiff's injuries were caused by the defendant's wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances. (Emphasis added).
Plaintiffs' alleged in their Third Supplemental and Amending Petition that they are entitled to damages under former article 2315.3 because "[t]he operations on the subject property by the defendants, particularly the improper disposal of saltwater and other waste products in violation of the various lease agreements constitutes the storage, handling, and/or transportation of hazardous materials ..."
The trial court granted a partial summary judgment, holding that plaintiffs are not entitled to exemplary damages. The court of appeal reversed, concluding that the jury could find that some of the substances on plaintiffs' property meet the definition of `hazardous and toxic substances' as defined in Chustz v. J.B. Hunt Transport, Inc., 95-0356 (La.11/6/95), 662 So.2d 450.[10]
We find that plaintiffs are not entitled to exemplary damages under former article 2315.3 because these damages are not applicable to breach of contract claims. Damages under 2315.3 are recoverable on a derivative basis where a plaintiff is entitled to recover tort damages. See Adams v. J.E. Merit Construction, Inc., 97-2005 (La.5/19/98), 712 So.2d 88 (found employee not entitled to recover punitive damages from his employer under 2315.3 because the first phrase of article 2315.3 providing that "in addition to general and special damages, punitive damages may be awarded...," implies that punitive damages are only available to those persons who are eligible to recover general and special *708 damages.) The basis of plaintiffs' claim under 2315.3 is that Shell improperly disposed of saltwater and waste products in violation of the lease agreement. When Shell failed to comply with the restoration provisions of the lease agreement, including the improper disposal of saltwater and waste products in and on the property, plaintiffs sued Shell for damages, not in tort, but as specifically provided under the terms of the contract.
According to plaintiffs, exemplary damages under 2315.3 are applicable in this case because the conduct by Shell constitutes both a breach of contract and a tort. Plaintiffs contend that there are two separate conducts by Shell in this case, one constituting breach of contract for its failure to reasonably restore and another constituting a tort for the intentional dumping and burying of various materials on plaintiffs' property. Plaintiffs argue that the fact that they entered into a contract does not waive the protections of a general public duty against tortious conduct.
We disagree. We recognize the long-standing rule that "when a party has been damaged by the conduct of another arising out of a contractual relationship, the former may have two remedies, a suit in contract, or an action in tort, and that he may elect to recover his damages in either of the two actions." Federal Insurance Company v. Insurance Company of North America, et al., 262 La. 509, 263 So.2d 871, 872 (1972). However, although plaintiffs argue that Shell's noncompliance under the terms of the contract also constitutes tortious conduct, plaintiffs did not bring a tort suit against Shell. Plaintiffs cannot now attach a claim under 2315.3 onto their breach of contract claim. Further, we find it questionable whether there were in fact two separate conducts by Shell or whether the burying of the various materials in and on the property falls within the failure to clean up or restore the property in violation of the contractual agreement to do so. In any event, in order to collect damages under former article 2315.3, plaintiffs needed to have filed a tort suit against Shell within the applicable prescriptive period. They did not do so and are, therefore, not entitled to exemplary damages.
Because we find that plaintiffs are not entitled to exemplary damages under former article 2315.3, we do not reach the issue of whether the actions by Shell constitutes "the storage, handling, or transportation of hazardous or toxic substances." Accordingly, we reverse the court of appeal's decision as to this issue and reinstate the trial court's dismissal of plaintiffs' claim under former article 2315.3.
Trespass
Shell argues that this Court should reaffirm the law on damages for a lessee's continued occupancy after the expiration of the lease.
The jury awarded plaintiffs $927,000.00 in damages for Shell's trespass on the premises for a period of 22 months after expiration of the lease agreement. The trial court granted Shell's motion for remittitur on the trespass claim, reducing the award to $32,500.00. The court of appeal found that the trial court erred in granting the remittitur because the record did not indicate that plaintiffs were given the opportunity to choose a new trial on the issue, rather than the remittitur in accordance with C.C.P. art. 1814. The court of appeal agreed with plaintiffs that whether they are entitled to the profits earned by Shell while it remained on the property without a lease depends on whether or not the possessor is in good faith or bad faith, pursuant to Rosenthal-Brown Fur Co. v. Jones-Frere Fur Co., *709 162 La. 403, 410, 110 So. 630, 632 (1926).[11] However, after noting that plaintiffs continued to discuss renewal of the lease with Shell even after sending the notice to vacate, the court of appeal found that Shell was not a bad faith possessor for the entire time that it remained on the property after the expiration of the lease. Thus, plaintiffs were not entitled to these damages for the entire period of time in which Shell was in possession after termination of the lease. Consequently, the court of appeal remanded this issue to the trial court for a proper calculation of the amount of damages to which plaintiffs are entitled during the period of bad faith possession by Shell.
Shell argues that the court of appeal's opinion unsettles the law with respect to the measure of damages in the situation where a lessee remains on the premises after the lease expires, over the objection of the lessor. Shell maintains that where a lessee, after the termination of his lease, continues to occupy the premises against the protest of the lessor, his liability in damages is to be measured by the rental market value of the property. Jackson Brewing Co. v. Wagner, 123 La. 798, 49 So.2d 529 (1909). Shell argues that the court of appeal wrongly imported into the law of leases the "good faith/bad faith" possessor rule from Rosenthal, supra, which involved the rights of good and bad faith possessors vis-a-vis the true landowner. Shell argues that because it was a holdover tenant, not a possessor without any right to enter the property in the first place, the law governing possessors is inapplicable. Thus, Shell urges this Court to reinstate the trial court's award of $32,500.00 as the proper measure of damages for trespass.
We do not find that the court of appeal erred in relying on Rosenthal in deciding that plaintiffs are entitled to profits earned by Shell during the time Shell remained on the property in bad faith, without a lease and over the objection of plaintiffs. At the expiration of the lease, all rights of Shell as a lessor effectively ceased. Its continued possession of the premises constituted trespass. Pursuant to Rosenthal, whether a possessor must account for profits depends on whether or not he is in good or bad faith. We agree with the court of appeal's conclusion that Shell was not a bad faith possessor for the entire time that it occupied the lease after its expiration due to the continued negotiations with the plaintiffs regarding the lease. However, as noted by the court of appeal, Shell became a bad faith possessor at some point. After suit was filed against Shell, Shell was fully aware that it had no legal rights to continue to occupy the property. Accordingly, the court of appeal's remand to determine the proper measure of damages during the time of bad faith possession is hereby affirmed.
Attorneys fees
The surface lease provides that the prevailing party in a suit under the lease is entitled to recover "reasonable attorney fees." Two of the five plaintiffs contracted with their attorney for an hourly rate, while the remaining three contracted with their attorney for a contingency fee of 33%. After a hearing on plaintiffs' motion to set attorney fees, the trial court awarded attorneys fees in the amount of *710 $689, 510.00. Plaintiffs argued that attorney fees should be awarded pursuant to their contracts with their counsel, i.e., 20% of the verdict, representing 5/8 of a 1/3 contingency fee, and 37.5% of the hourly fees shown on the time records, representing the remaining 3/8. The trial court refused to award attorney fees based in part upon the contingency contract of three of the plaintiffs with their counsel, finding that Shell did not participate in the "assumption of the risk" associated with a contingency fee contract. According to the court, the terms of a contingency fee contract would not be reasonable under the terms of the lease.
The court of appeal increased the attorney fees award to $4 million dollars. The court of appeal reasoned that although it recognized that the trial court has great discretion in determining an award of attorney fees, under the circumstances of this case, it found that the trial court's award was abusively low. In so finding, the court of appeal considered the factors identified in State, Department of Transportation and Development v. Williamson, 597 So.2d 439, 441-42 (La.1992) to be considered by a court in reviewing an award of attorney fees:
Factors to be taken into consideration in determining the reasonableness of attorney fees include: (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) amount of money involved; (5) extent and character of the work performed; (6) legal knowledge, attainment, and skill of the attorneys; (7) number of appearances made; (8) intricacies of the facts involved; (9) diligence and skill of counsel; and (10) the court's own knowledge.
A review of these factors by the court of appeal revealed:
plaintiffs' counsel's work in this case resulted in a $50 million award in favor of their clients; it involved great responsibility by the attorneys to prepare and carry the case through trial; the litigation is more likely than not the greatest monetary issue their clients will face in their lifetimes; Plaintiffs' counsels' presentation of the case reflect the tremendous effort, skill, and knowledge required of them; the character of the work and the attorneys themselves are also reflected therein; the trial itself lasted eleven days; the volumes of exhibits and the length of the trial are just a small reflection of the time required for preparation of the matter for trial; the facts of the case were not extremely complicated, but the evidence to establish Plaintiffs' claim was extensive requiring much investigation, diligence and skill of counsel; this matter was factually and legally intensive; and the court's own knowledge of the law was supplemented by counsel throughout the trial.
Corbello, 806 So.2d at 52.
Shell argues that the court of appeal misapplied the abuse of discretion standard by substituting a new, much larger attorney's fee award. Shell maintains that where, as here, the trial court considered all the attorneys fees factors from Williamson, the trial court does not abuse its discretion. L & L Constructing Co. v. Ram Indus. Coatings, Inc., 99-0354 (La.App. 1 Cir. 6/23/00), 762 So.2d 1223, 1237-38, writ denied, 00-2232 (La.11/13/00), 775 So.2d 438. Further, Shell argues that in applying the Williamson factors, the trial court made clear that it did consider the contingent fee contract as a factor. However, the trial court recognized that the contingent fee, while a factor to be considered, should not control the attorney's fee award.
*711 After review of the Williamson factors, we find that the court of appeal correctly concluded that the trial court's award of $689,510.00 in attorney fees was abusively low. Considering the above factors, along with the additional work done by plaintiffs' attorneys on the appellate levels, we do not believe that $4 million is an unreasonable attorney fee award. Accordingly, we affirm the court of appeal's decision in this regard.

CONCLUSION
Based on the above analysis, the decision of the court of appeal reinstating plaintiffs' claim for exemplary damages is hereby reversed; the breach of contract award for unauthorized disposal of saltwater is reversed and remanded to the court of appeal to determine the correct amount using the lawful rate of prejudgment interest; the court of appeal's decision in all other respects is hereby affirmed.
WEIMER, J., concurs.
CALOGERO, C.J., concurs.
VICTORY, J., dissents in part.
KNOLL, J., dissents in part and assigns reasons, concurs in part with reasons, and concurs in the result.
TRAYLOR, J., concurs in part and dissents in part.
VICTORY, J., dissenting in part.
I dissent from the majority opinion affirming the $33,000,000.00 breach of contract award for Shell's failure to reasonably restore plaintiff's property. The contract between the parties requires only that Shell "will reasonably restore the premises as nearly as possible to their present condition." The jury was clearly wrong in determining that $33,000,000 was a "reasonable" amount of money to restore a piece of property worth $108,000.00. Further, $28,000,000 of that $33,000,000 was awarded to install a groundwater recovery system to protect the Chicot Aquifer[1] from contamination. However, plaintiffs failed to offer any reliable, scientific evidence demonstrating a substantial threat to the aquifer, and its expert did not test the aquifer for contamination. In any event, since $28,000,000 of the award is to protect the aquifer, the landowner should be required to use the money to install the groundwater recovery system.
KNOLL, J., dissenting in part, concurring in part with reasons, and concurring in the results.
I dissent from the majority's resolution of the saltwater disposal damage issue. The jury heard ample testimony, expert and lay, of how Shell ran roughshod over the plaintiffs in the disposal of saltwater on the plaintiffs' property without contractual authority. It is evident that Shell exercised calculated business acumen and consciously made a financial decision that it would behoove them to breach the contract in this manner and thereby reap substantial financial savings that would benefit the company many times over. The record supports that the jury's award of $16,679,100 for this item of damages was more than justified because it found Shell's conduct so egregious in this regard and it was particularly knowledgeable that Shell reaped uncompensated financial benefits from its extra-contractual conduct. Indeed, I find the record shows that Shell's conduct in breaching the contract with plaintiffs was particularly egregious for a long period of time. Under the unique *712 circumstances of this case, prejudgment interest does not adequately address this damage item. From a policy standpoint, I find that the award of prejudgment interest sends the wrong message to those who, like Shell, choose to breach a contract. It may be that driven by the savings and the investment of those savings, Shell may have made a business decision that it is more profitable to breach a contract than to abide by its terms.
William Griffin, an expert petroleum engineer, and Dan Cliffe, a CPA/economist, provided the jury with detailed testimony on Shell's extra-contractual activity on the plaintiffs' property. Griffin's testimony established the volume of illegally disposed of saltwater at 1,629,723 barrels. He further opined that it would have cost Shell $1 a barrel to dispose of that saltwater if it would have had to contract out that project. Relying on Griffin's testimony and the figures he derived, Cliffe examined the $1,629,723 cost saving to Shell and then determined the present value that those cost savings provided Shell from its illegal saltwater operations on plaintiffs' property was $28,031,108. In further testimony, Cliffe also testified that accounting only for inflation, the present day value of the $1,629,723 was $6,908,324.
In its instructions to the jury, the trial court stated, in pertinent part:
In this case the plaintiffs have sued for breach of contract damages.

* * *
Shell's disposal of any saltwater that was not produced from its own wells in the Iowa Field was a breach of the surface lease it signed in 1961 with the Heyd family. You must determine the amount of damages, if any, that are owed by Shell as a consequence of that breach.

* * *
In this regard, I recall to your attention the words of Article 1995 of our Civil Code which states that "Damages are measured by the loss sustained by the plaintiff and the profit of which it has been deprived." Therefore, if you find that the plaintiffs have suffered damages as a result of a breach of contract by Shell, you are to award damages measured by the plaintiff's lossesand any profit of which the plaintiffs have been deprived,

This article and our law suggests simple reparation, a just and adequate compensation for injuries. Your award should be designed to fully and fairly compensate the plaintiffs for the damage to their property, if you find damage has occurred and should not go beyond such reparation.
(Emphasis added).
In its second supplemental and amending petition filed on February 24, 1993, the plaintiffs alternatively urged that they "desire and are entitled to damages from defendants pursuant to theories of quasi-contract, unjust enrichment, and/or quantum meruit." "Quasi-contracts are willful and lawful acts [that] give rise to obligations without the concurrence of wills, that is, without the agreement of the persons involved that is necessary for the formation of a contract." SAUL LITVINOFF, 5 LOUISIANA CIVIL LAW TREATISE: THE LAW OF OBLIGATIONS, § 1.6 at 10. Examples given of quasi-contracts in LA. CIV.CODE ANN. art. 1757 are: the management of the affairs of another (negotiorum gestio) and unjust enrichment.
Unjust enrichment is founded on the equitable principle that no one should be enriched at the expense of another. Minyard v. Curtis Products, Inc., 251 La. 624, 205 So.2d 422 (1967). In order to employ *713 such a remedy, each of the following elements must be proven: (1) there must be an enrichment; (2) there must be an impoverishment; (3) there must be a connection between the enrichment and resulting impoverishment; (4) there must be an absence of "justification" or "cause" for the enrichment and impoverishment; and (5) there must be no other remedy at law available to plaintiff. Edmonston v. A-Second Mort. Co. of Slidell, Inc., 289 So.2d 116 (La.1974); Minyard, 205 So.2d at 422.
The error I find in the majority's adoption of prejudgment interest is its failure to realize that this case does not present a traditional damage situation. In my view, Shell has impermissibly received a benefit (i.e., a cost savings and profit for not having to pay for the disposal of saltwater) to the detriment of the plaintiffs/landowners and it now needs to account for this savings and the profits derived therefrom. It is evident that Shell's enrichment and the plaintiffs' impoverishment are inextricably tied and the plaintiffs have no other remedy at their disposal. In short, unjust enrichment provides the proper framework for this element of damages and the jury's award of $16,679,100.00 is fully supportable in such an analysis. I respectfully dissent on this issue and I would maintain the jury's award of $16,679,100.00, finding no manifest error as it is it fully supported by the record.
While I dissent from the majority opinion on the issue of saltwater damages, I concur in the results of the remaining issues with the exception of the issue of exemplary damages in which I concur for the following reasons.
Under this state's jurisprudence, the term "general damages" refers to that category of damages which may not be fixed with any degree of pecuniary exactitude, but which involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle which cannot be measured definitively in terms of money. Boswell v. Roy O. Martin Lumber Co., 363 So.2d 506 (La.1978); Foster v. Trafalgar House Oil & Gas, 603 So.2d 284, 285 (La.App. 2 Cir.1992); Glasper v. Henry, 589 So.2d 1173 (La.App. 4 Cir.1991); Anderson v. Bennett Wood Fabricators, 571 So.2d 780 (La.App. 2 Cir. 1990). In particular, the jurisprudence of this state has recognized that damages for non-pecuniary loss, such as mental anguish, are actual or compensatory in nature. See McGee v. Yazoo & M.V.R. Co., 206 La. 121, 19 So.2d 21, 24 (1944); Eubanks v. State, DOTD, 620 So.2d 954 (La. App. 3 Cir.1993).
Although as a general rule, damages in contract cases do not involve non-pecuniary damages, LA. CIV.CODE ANN. art.1998 provides:
Damages for nonpecuniary loss may be recovered when the contract, because of its nature, is intended to gratify a non-pecuniary interest and, because of the circumstances surrounding the formation or the nonperformance of the contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss.
Regardless of the nature of the contract, these damages may be recovered also when the obligor intended, through his failure to aggrieve the feelings of the obligee.
Accordingly, this state's jurisprudence has recognized that a contract may be breached in a manner that warrants recovery by the aggrieved party of damages for the non-pecuniary loss he sustained because of such a breach. See, e.g., Vogel v. Saenger Theatres, Inc., 207 La. 835, 22 So.2d 189 (1945) (holding that a patron who is refused admittance to a theater because of a physical infirmity may recover damages *714 for embarrassment and mortification); Daquano v. Brady, 242 So.2d 302 (La.App. 1 Cir.1970) (holding that non-pecuniary damages were due from a seller of a house who, before delivery, purposely destroys the home's interior); Mayerhofer v. The Three R's Inc., 597 So.2d 151 (La.App. 3 Cir.1992) (holding that damages for non-pecuniary loss are recoverable for the breach of a contract to build a home).
On this basis alone, I do not find it sufficient to conclude that article 2315.3 (former) is not applicable because the opening words of the article limit its application to tort claims. Even if punitive damages under this article are derivative, general damages, vis-a-vis non-pecuniary damages, are awardable in certain contract cases. Compare Adams v. J.E. Merit Construction, Inc., 97-2005 (La.5/19/98), 712 So.2d 88, a case in which general damages were not available because of the workers' compensation laws.[1]
That being said, even though the majority opinion resolves this issue in another manner, my analysis yields the same result. It is clear that exemplary damages are derivative, Adams, 712 So.2d at 88. Thus, exemplary damages would have to flow from a claim for non-pecuniary damages. My review of the record shows the plaintiffs did not seek non-pecuniary damages from Shell for breach of contract.See n.1, supra. Thus, the plaintiffs may not be awarded exemplary damages under LA. CIV.CODE ANN. art. 2315.3.
TRAYLOR, J., dissenting in part and concurring in part.
I dissent from the majority's reduction of the damages awarded for Shell's disposal of 1,629,723 barrels of salt water on the plaintiffs' property. As stated by Justice Knoll in dissent, the best method of determining the plaintiffs' damages is by utilization of the remedy of unjust enrichment. The plaintiffs' expert economist testified that the cost savings to Shell was over $28 million, an amount well in excess of the $16,679,100 awarded by the jury. I do not believe that the jury award for damages due to the dumping of the salt water was unreasonable.
I concur with the remainder of the majority opinion.
PER CURIAM.
Rehearing granted in part for the sole purpose of clarification, otherwise denied.
This court granted a partial rehearing to clarify our views on the required burden of proof in environmental pollution cases, which remains proof by a preponderance of the evidence.
In applying for a rehearing, Shell focuses on the following highlighted language to state that damage to the Chicot Aquifer was speculative:
The court of appeal reviewed the expert testimony of both sides on the issue of the threat to the Chicot Aquifer and concluded that the jury was not manifestly erroneous in accepting the testimony of plaintiffs' expert, Mr. Arabie. As did the court of appeal, we find Mr. Arabie's testimony persuasive. As we previously stated, Mr. Arabie's investigation was extensive. In his opinion, the contamination of the property poses a threat to the Chicot Aquifer. He explained that because of the depth of the contamination and the nature of the *715 clays between the contamination and the aquifer, contamination may travel into the aquifer. Mr. Arabie also testified that Shell's expert, Mr. Deuel, agreed in deposition that it was possible the drinking water source might be contaminated. [Emphasis supplied.]
Corbello v. Iowa Production, 2002-2826, pp. 13-14 (La.2/25/03), 850 So.2d 686, 697-98, 2003 WL 536727.
Contrary to Shell's argument, the few sentences quoted above should not be seized upon, now or in future cases, as allowing compensation if the harm done is only potential, as opposed to actual harm. Proof of actual damages by a preponderance of evidence is required to be entitled to compensation for environmental damages. In this matter, the plaintiffs met their evidentiary burden and established Shell polluted their property and established the amount of compensation necessary to remediate the property. The plaintiffs also established that this contamination posed a substantial risk to the aquifer.
The evidence in this case clearly supports a conclusion by the jury that the groundwater beneath the plaintiffs' property was polluted by Shell. Thus, an award for restoration, including the $28 million for clean-up of the groundwater, was within the jury's discretion. The further fact that the pollution was a threat to the Chicot Aquifer was merely one factor in the plaintiffs' case; it was not an essential element of plaintiffs' cause of action for actual damage to the property by pollution.
Nevertheless, because the threat to the Chicot Aquifer was an issue presented to the jury, we reiterate that plaintiff's expert on restoration, Austin Arabie, was of the opinion that "the contamination of the property poses a threat to the Chicot Aquifer." Id.
A persuasive portion of Mr. Arabie's expert testimony informed the jury of his examination of Shell's own tests and reports, which evidence was unrefuted by Shell. Shell's 1984 report showed soil samples with thirty-five percent hydrocarbons, which is significantly excessive in light of the state regulation that allows only one percent oil field waste to be left on the site. Later, Shell's 1991 report was consistent with the earlier one, and the soil samples also showed a high level of salts. The state's limit of electrical conductivity in the soil, an indicator of the presence of salt, is four, but Shell's soil samples revealed a level of thirty. Early use by Shell of unlined pits resulted in saltwater seeping through the ground into the soil.[1]
Environmental expert Dr. Lloyd Deuel was employed by Shell to analyze soil samples and groundwater samples prior to trial, but he was not called as a witness by Shell despite his presence at trial. Dr. Deuel found the groundwater contained benzene contamination higher than former standards and also higher than more lenient newer standards. He also found the samples exceeded DEQ's established, initial screening limits for heavy metals. Consistent with his reports that do not rule out drinking water contamination, Dr. Deuel agreed it was possible that drinking water sources, such as wells in the area, might be contaminated from the oilfield waste he found, such as benzene, cadmium, silver, lead, and other toxic poisons, substances different from oil, grease, or salt. Unexplainably, Dr. Deuel testified at deposition that he would wait until someone *716 complained before taking any action to address the groundwater contamination.
In addition to showing a history of overflows and seepage from the pits, Shell's records reveal that in the 1970's, its two injection wells for saltwater disposal evidenced underground leakage and "communication" at a site where the aquifer is 120 to 130 feet underground. When Shell pumped saltwater into one injection well, it came out at the other injection well; the saltwater had to pass through the Chicot Aquifer or through the sands and clays immediately above the aquifer.[2]
Plaintiffs' expert, Mr. Arabie, took samples from various locations on plaintiffs' property which showed significant groundwater contamination, although the full extent of it has not been documented. The salt content at 20 to 21 feet was 100 times greater than what would occur naturally in the soil, almost like seawater, and salt pollution can last for hundreds of years. Although drinking water wells are typically 200 feet deep, the Chicot Aquifer is from 120 to 130 feet underground, but it could be as high as 50 to 70 feet beneath this particular property. Studies have been made of the chlorides (salt) in the Chicot Aquifer, and the studies show a surprisingly high amount of chlorides in the Iowa Field, the site of the plaintiffs' property. Thus, Mr. Arabie is of the opinion the contamination of plaintiffs' property should be taken very seriously as an explanation of the increased salt in the aquifer. In the areas where groundwater beneath plaintiffs' property leaches to lower levels, it would carry the contamination to the aquifer.[3]
Mr. Arabie concluded that the subsurface communication of the two injection wells, considered together with the high salt level of the Chicot Aquifer at this location, was "significant evidence" that the aquifer is contaminated below the plaintiffs' property. Mr. Arabie, who has been involved in actual cases of the Chicot Aquifer being remediated, summarized: "We know right now that the water 10 to 12 feet is contaminated. We know that the water at 22 to 24 feet is contaminated. There's also another water zone at a little more than 50 feet that hasn't been investigated yet.... Shell's contractors drill[ed] to it, but they didn't sample it to see if it was contaminated.... [T]hat may be contaminated because the fractured clays are right above that, and it's not unusual to see that zone contaminated ... at least down to 50 feet."
Thus, there is sufficient evidence and adequate proof that the groundwater was contaminated and that the groundwater contamination beneath the property of the plaintiffs invaded the aquifer: proof of higher salt concentrations within the aquifer which the expert testified were probably from the salt water injection wells, not from the Gulf of Mexico; fractures in the clays allowing communication; Shell's own records indicating communication between the two injection wells at a depth of 95 feet.
The threat to the aquifer is real; the pollution on the plaintiffs' property is undisputable. *717 The damage award is to clean the plaintiffs' property in order to prevent the pollution from further migrating into the aquifer. Regardless of who owns the groundwater, it is the pollution left on plaintiffs' property by Shell which is the source of contamination of the aquifer.
NOTES
[1] Although the actual settlement documents do not appear in the record, it appears that, prior to trial, plaintiffs entered into a settlement with Polaris Enterprises, Inc., formerly known as Iowa Production Company, Inc.
[2] The Chicot Aquifer is the public drinking water supply for the City of Lake Charles. The Chicot is approximately 120 to 130 feet deep. There are shallower sands of the Chicot that are approximately 50 to 70 feet deep. The Chicot is located beneath the area of the Iowa field and is wide spread across this area of the state.
[3] LSA-R.S. 30:89.1 reads, in pertinent part:

"In the event an owner of a property interest in an oilfield site, or in other property affected by oil or gas exploration, development, or production activities on an oilfield site, obtains a final judgment from a court of competent jurisdiction, pursuant to the provisions of this Title or any other law or regulation or any obligation whatsoever, including but not limited to obligations imposed by contract or by law, ... then in any action, judicial or administrative, by the state of Louisiana or any state agency to enforce any law or regulation with regard to the consequences of the same oil or gas exploration, development, or production activities on the same oilfield site, the party against whom such judgment was rendered, or who is obligated by such compromise, shall be given full credit against the obligation sought to be enforced by the state of Louisiana or any state agency, and such obligation shall be reduced proportionately..."
[4] When this suit originated, Shell was represented by the law firm of Adams and Reese. However, Liskow & Lewis subsequently enrolled as counsel for Shell and assumed primary responsibility for Shell's representation, though Adams & Reese did not withdraw. A few days prior to trial, counsel for Rosewood wrote the district court alleging that Liskow & Lewis had a conflict of interest because Liskow & Lewis was already representing Kingfisher Resources, Inc., a corporate affiliate of Rosewood in another matter in federal court. This letter does not appear in the record, but the trial transcript does contain the oral arguments by counsel for and against the motion.

A review of the transcript reveals that Rosewood vigorously objected to Liskow and Lewis' representation of Shell because of its existing representation of Rosewood. The transcript also reveals that in an effort to resolve this conflict, the trial judge offered Shell the opportunity to stipulate that the third-party demand against Rosewood was merely for the purpose of reducing a recovery of the plaintiffs against Shell. After a short recess, allowing Shell additional time to consider the stipulation, the trial judge presented Shell with three options: (1) to enter into the proposed stipulation, (2) to allow Adams & Reese to take over representation and go to trial, or (3) to dismiss the third-party demand. After Shell refused to accept the stipulation, the trial court dismissed Shell's third-party demand against Rosewood, with prejudice.
[5] The court of appeal also denied plaintiff's motion to defer and consolidate Shell's appeal regarding the third party demand dismissal with the anticipated appeal from the judgment in the underlying case, finding that the issues raised were clearly separable.
[6] It appears that any argument regarding the dismissal of Rosewood based on the alleged conflict of interest is now moot, given that the trial court and court of appeal have decided the issue of fault on the part of Rosewood on the merits of this case.
[7] Shell cites La. C.C. art. 1804, which provides that "[i]f the [solidary] obligation arises from a contract ... virile portions are equal in the absence of agreement ... to the contrary."
[8] It is noted that the court in Kirby cites no authority and gives no reasons for its finding that the trial court could not lawfully use the CPI to bring past lost up to present value.
[9] The article was repealed in 1996, but "only as to causes of action which arise on or after the effective date hereof." La. Acts 1996, 1st Ex.Sess., No. 2, § 1.
[10] In Chustz, we found that "although [article 2315.3] does not define hazardous or toxic substances, the words must be given their generally accepted meaning. LSA-C.C. art. 11." Chustz, 662 So.2d at 451. We went further to define hazardous substances as "those that present substantial danger to public health or the environment. A toxic substance is a substance poisonous to living organisms. Thus, the terms "hazardous" and "toxic" refer to substances which cause injury or death to human beings and/or create an environmental hazard." Id. at 451.
[11] In Rosenthal, the court stated:

[O]ne who unlawfully, and against the will of the owner of the land, exercises thereon rights belonging exclusively to the owner, must account to such owner for all the fruits of his unlawful exercise of that right... this being in accord with the moral maxim of the law that `no one ought to enrich himself at the expense of another.'
[1] The Chicot Aquifer is the public drinking waster supply for Lake Charles, part of which is located far beneath the surface of the Iowa field.
[1] I point out that our decision in Adams was rendered years after the plaintiffs filed their first pleadings in this matter. Accordingly, at the time this litigation first began we had not yet announced the principle that exemplary damages under LA. CIV.CODE ANN. art. 2315.3 were derivative.
[1] The state regulatory agencies began requiring lined pits because it became apparent unlined pits would leak into the groundwater.
[2] Mr. Arabie testified the clays in the area are "fractured," analogous to a dried-up mud puddle, which allows water to seep through. Thus, the Chicot Aquifer is vulnerable to groundwater contamination moving through the fractured clays.

At trial, Mr. Arabie explained that at his deposition he answered he could not say the aquifer was contaminated by the groundwater because he was asked to eliminate the evidence of the leaking injection wells from his consideration.
[3] Further, the benzene content of the groundwater beneath plaintiffs' property is excessive, as found by Shell's expert, and as confirmed by Mr. Arabie's sampling.